665 F.2d 781
 1981-2 Trade Cases 64,393
 The UNITED STATES TROTTING ASSOCIATION, an Ohio non-profit
corporation, Plaintiff-Appellant,
v.
CHICAGO DOWNS ASSOCIATION, INC., Fox Valley Trotting Club,
Inc., and Illinois Harness Horsemen's Association,
Defendants-Appellees.
 Nos. 80-1948 to 80-1950.
 United States Court of Appeals, Seventh Circuit.
 Argued Sept. 10, 1981.
Decided Dec. 8, 1981.
 
 A. Vernon Carnahan, New York City, for plaintiff-appellant.
 Thomas D. Nash, Jr., Chicago, Ill., Dominic H. Frinzi, Milwaukee, Wis., for defendants-appellees.
 Before CUMMINGS, Chief Judge, and PELL, SPRECHER, BAUER, WOOD and CUDAHY, Circuit Judges, en banc.
 CUMMINGS, Chief Judge.
 
 
 1
 Plaintiff United States Trotting Association (USTA) brought these three actions against Chicago Downs Association, Inc. and Fox Valley Trotting Club, Inc., alleging that they had unlawfully appropriated USTA's property. The three actions were consolidated in the district court and remain consolidated here.
 
 
 2
 In the first suit (district court number 77-C-3312; our number 80-1948) USTA alleged that Chicago Downs, an Illinois management corporation that sponsors race meetings at Sportsman's Park, a harness race track in Cicero, Illinois, used USTA registration and eligibility certificates during 1975 and 1977 when Chicago Downs was not affiliated with USTA and thereby unlawfully appropriated USTA's property. In the second suit (district court number 77-C-3313; our number 80-1949) USTA made the same allegation against Fox Valley, another Illinois management corporation sponsoring harness horse-racing meetings at Sportsman's Park, with respect to meetings conducted in 1975 and 1977. Both suits sought an accounting, a money judgment and an injunction against continuing misappropriation. USTA's third suit (district court number 78-C-1258; our number 80-1950) sought to enjoin Fox Valley from using USTA certificates during and after the 1978 racing season.
 
 
 3
 Fox Valley filed an answer and then a counterclaim in the third of the suits. Count I of its counterclaim charged USTA with instigating a group boycott against it in violation of Section 1 of the Sherman Act. Count II charged USTA with tortiously interfering with the contractual and business relations between Fox Valley and the Illinois Harness Horsemen's Association (IHHA).[1]
 
 
 4
 Conceding for the time being that there were no material factual issues in dispute, the parties filed motions for summary judgment on all issues. The district court granted defendants' motion for summary judgment on USTA's misappropriation claim because USTA had failed to show that it owned the registration and eligibility certificates. 487 F.Supp. 1008, 1012-1014 (N.D.Ill.1980). Fox Valley's motion for summary judgment on its antitrust counterclaim was granted on the ground that USTA's conduct was a group boycott per se violating Section 1 of the Sherman Act. 487 F.Supp. at 1014-1016. As to Count II of Fox Valley's counterclaim, Judge Aspen held that it was entitled to summary judgment since USTA's actions amounted to tortious interference "with the business relationship existing between the tracks and the horsemen." 487 F.Supp. at 1016-1017. A permanent injunction was subsequently entered barring USTA from invoking any of its by-laws or rules "to sanction any of its horseowner or driver members solely by reason of their participation in any future Fox Valley harness race meetings while Fox Valley is neither a USTA member nor contract track." Various racing associations have filed amici curiae briefs urging reversal.[2] We reverse the district court's summary judgments and remand for further proceedings consistent with our opinion. We also vacate the permanent injunction awarded to Fox Valley.
 
 I. Background of Litigation
 
 5
 USTA is an Ohio incorporated, non-profit service organization. It was founded in 1939 to counteract widespread problems in harness racing. Before that time a plethora of local sanctioning organizations had produced inconsistent regulations; record-keeping was spotty; penalties proved unenforceable; and the sport had fallen into general disrepute. The purpose of USTA was to develop comprehensive national records and to promulgate uniform rules and standards. USTA has never had any interest in breeding, buying, selling, or racing horses, nor any investment in race tracks or race meetings. It operates solely as a sanctioning organization and information bank. Since its inception, USTA has grown in size and influence. In 1977 it had 40,861 active members,[3] including 426 fair race tracks and 65 parimutuel tracks. Only members can register standardbred horses with the USTA and obtain eligibility certificates documenting a horse's performance in a given racing season. Only members can vote on matters of USTA governance. Nonetheless, tracks that do not wish to become USTA members can affiliate as "contract tracks," paying to use USTA services on the same basis as member tracks, i.e., a percentage of the parimutuel take for each racing day, not in excess of $330 per day. See United States Trotting Association Charter, By-Laws, Rules, and Regulations ("Rules") Art. I, § 4 and Art. VII, § 1.
 
 
 6
 Owner members of USTA register their standardbred horses with USTA. USTA issues a registration certificate to the owner that describes in detail the horse's physical markings and pedigree, and identifies its owner and breeder. The reverse side of the certificate provides space to record any transfers of ownership of the horse. In addition, USTA maintains central records of the information on the registration certificates and of any transfers of title, so that attempts to tamper with the certificates can be detected.
 
 
 7
 USTA also issues an eligibility certificate for each registered horse. This certificate contains performance information compiled from the horse's last eight starts in the prior racing season. Throughout the current season, pertinent information about the horse's performance in each of its races is added to the certificate by the clerk of the racecourse, a track employee who is licensed by USTA. The clerk of the course also records the same information on a "Judge's Sheet" which is forwarded to USTA, thus making it possible to detect discrepancies or alterations in the eligibility certificates.
 
 
 8
 Eligibility certificates are used by track officials to select competitive horses for balanced race fields. Registration certificates are chiefly important in insuring accurate identification and honest transfers of harness horses. They also play a limited role in actual racing activities. Many tracks, including Chicago Downs and Fox Valley, run "claiming races," in which a price is established at which the winning horse can be purchased or "claimed." Such tracks, including Chicago Downs and Fox Valley, require that the USTA registration certificate be surrendered to the new owner before the claiming amount is disbursed. The purpose of the claiming race is to keep owners from entering superior horses in mediocre fields, again to foster competitive races.
 
 
 9
 In Illinois the legislature has relied on the offices of USTA as an integral part of its regulatory scheme. Illinois law requires that all horses entering harness races be "registered as (harness or standardbred horses) with and meet ( ) the requirements of and (be) approved by the United States Trotting Association." Ill.Rev.Stat.chap. 8 § 37-3.06(c) (1979). In addition the Illinois Racing Board Rules provide that any harness horse entered at a parimutuel track have a current USTA eligibility certificate (Rule 9.01), that all matters relating to registration of harness horses be governed by USTA rules (Rule 9.02), that all horses be tattooed with their USTA identification number (Rule 7.08), that persons suspended by USTA be barred from participating in harness race meetings (Rule 5.10), and that clerks of the course send race information to USTA and the Illinois Racing Board (Rule 6.18). The thirteen other states that allow parimutuel harness racing have similarly incorporated USTA standards in their regulatory systems (App. 304-305).
 
 
 10
 During the 1975, 1977, and subsequent racing seasons,[4] neither Chicago Downs nor Fox Valley joined USTA as a regular member or contracted to buy USTA's services. Both continued to hold races with USTA-registered horses and to use the information contained on USTA registration and eligibility certificates. Both continued to provide USTA with information about racing performances by forwarding Judge's Sheets to USTA headquarters. Each of the defendants thus enjoyed a paradigmatic "free ride," receiving all of the benefits of USTA affiliation with none of the attendant costs.
 
 
 11
 In an effort to put an end to this free riding, USTA announced to its members its intention to invoke certain sanctions.[5] It would henceforth, it said, provide no services to Fox Valley and Chicago Downs. Nor would it enter in its records information about racing performances at the defendants' meets. Finally, it directed its members' attention to Rules 5 and 17 of its by-laws. The USTA eligibility certificate application states that members are prohibited from racing horses at meets sponsored by organizations that are not USTA members or contract tracks. Members who violate this prohibition are subject to revocation of their eligibility certificates and may be precluded from obtaining certificates for future racing seasons. Rule 5, § 1. Furthermore, USTA member drivers who drive horses at unaffiliated tracks can be fined up to $100 for each infraction. Rule 17, § 5. These rules are necessary, USTA asserts, to protect its system of racing information "from those who might act to undermine it" and to ensure the "integrity of (its) data system" (Br. 14). The rules were upheld as reasonable restraints in United States v. United States Trotting Association, 1960 CCH Trade Cases P 69,761 (S.D.Ohio 1960).
 
 II. USTA's Misappropriation Claim
 
 12
 In its first two complaints USTA contended that defendants had misappropriated its records and services, particularly its registration and eligibility certificates, and therefore sought an accounting, money judgments and injunctive relief. After defendants filed a motion for summary judgment on the ground that the certificates were the property of the horse owners to whom issued, USTA filed a cross-motion for summary judgment on the ground that its affidavits and exhibits showed that defendants were liable for misappropriation of plaintiff's property. The district court held that USTA had failed to persuade it that USTA owned the registration and eligibility certificates and therefore granted defendants' motion for summary judgment, stating that "USTA has established no proprietary interest in the certificates or the information contained therein." 487 F.Supp. at 1014 and n. 22. However, the court and defendants left unanswered USTA's affidavits and documentary materials supporting its cross-motion.
 
 
 13
 In support of affirmance defendants contend that USTA's cross-motion for summary judgment precludes it from now claiming that there are certain disputed questions of fact. But the filing of a cross-motion for summary judgment does not prevent a plaintiff from contending on appeal that there is a dispute as to material facts. Case & Co., Inc. v. Board of Trade of City of Chicago, 523 F.2d 355, 360 (7th Cir. 1975).
 
 
 14
 The eligibility certificates have the following legend on their face:
 
 
 15
 This eligibility certificate and the information contained on it are the property of USTA and all rights to its use and reproduction are reserved by it. Use of this certificate and the information contained hereon is restricted to members of USTA and tracks contracting with the Association and only for the purposes of entering, classifying and identifying the horse named hereon and for recording its performances. Permission for any other use of this certificate and the information contained on it or for its use by any other person or organization must be obtained from USTA.[6]
 
 
 16
 In deciding that this language did not raise an inference of ownership, the district court found that "th(e) expression of ownership is negated by the adhesive nature of the contract between horsemen and USTA." 487 F.Supp. at 1014. The record, however, does not support a finding of adhesion. We do not deal here with parties of vastly disparate bargaining power, to whose agreements the adhesion doctrine is properly applied. Rather horseowners and other USTA members collectively select a Board of Directors which supervises the USTA and which, together with the officers, establishes USTA's operating procedures. Thus there are institutional means available through which the horseowners collectively can modify or eliminate any terms in the eligibility certificates with which they disagree.
 
 
 17
 The adhesion argument has also been recently rejected in a challenge to a forum selection clause in the USTA by-laws. In language equally applicable here the court said:
 
 
 18
 Plaintiffs assert that the USTA has successfully achieved its goal of regulating the entire harness racing industry, and that by virtue of its control of the sport, membership in the USTA is, practically speaking, compulsory for all who wish to compete in the United States and Canada. Thus, plaintiffs argue, the forum clause is in reality part of a "contract of adhesion" to which they did not freely assent. But, even assuming the accuracy of their description of the USTA's power, plaintiffs' contention that the by-law is thus unenforceable as a matter of contract law * * * cannot be accepted. This is not a situation where the court is asked to enforce a highly prejudicial term in a contract between two parties of significantly different bargaining power, which term is to the benefit of the stronger and the detriment of the weaker. Plaintiffs have entered into a contract with their fellow members, who adopted the instant by-law for their mutual benefit. Collectively, they retain the power to change it. Cases concerning overwhelming bargaining power in a commercial context are simply inapposite. Moreover, plaintiffs' argument proves too much, for it would vitiate every by-law of a host of membership associations.
 
 
 19
 Cruise v. Castleton, Inc., 449 F.Supp. 564, 570 (S.D.N.Y.1978) (citation omitted). In our view, the language on the eligibility certificates is not nullified by adhesion; instead it is valid and sufficient to rebut the presumption that ownership of the eligibility certificates rested with horsemen who happened to possess them.[7]
 
 
 20
 USTA ownership of the registration certificates presents more difficult issues. Unlike the eligibility certificates, the registration certificates do not contain an explicit affirmation of USTA ownership. Once issued by USTA, registration certificates remain in the possession of the horseowner, except when they are temporarily sent to USTA to record transfers of title. Judge Aspen likened the registration certificates to certificates of registration of motor vehicle ownership. 487 F.Supp. at 1013 n. 18. Like USTA, the State has a strong interest in accuracy and up-to-date ownership information, but it does not, at least in Illinois, own motor vehicle registrations.[8] Resisting this analogy, USTA notes that horseowners do not have unfettered control over the use of registration certificates: USTA can impose penalties on owners who fail to report sales of registered horses or who submit false information; and USTA can cancel registration certificates if the information on them is incorrect. USTA also emphasizes the importance of the registration certificates to its centralized recordkeeping. On the present record we agree with the court below that USTA has not met the burden of proving ownership in the registration certificates and therefore lacks the predicate for a misappropriation claim as to them. Our ruling, however, does not prevent USTA from submitting further evidence on remand to show that it has sufficient ownership rights to ground a misappropriation claim.
 
 
 21
 In sum, USTA is entitled to an accounting, damages and an injunction on the misappropriation claim based on the eligibility certificates. USTA may also be able to adduce further facts to support its ownership claims in the registration certificates.[9] Even if it cannot, however, judgment for defendants "should not be construed as suggesting that USTA is not entitled to reimbursement for the services it provides to nonmember tracks." 487 F.Supp. at 1014 n. 22. USTA will have the burden of identifying the services and proving a reasonable charge for them. Id. at 1017 n. 37.
 
 III. Fox Valley's Antitrust Claim
 
 22
 In the third of the suits consolidated here, Fox Valley filed a counterclaim alleging that USTA's threatened enforcement of its Rules 5 and 17 would be a group boycott, per se violative of Section 1 of the Sherman Act (15 U.S.C. § 1) which declares illegal "every contract, combination * * *, or conspiracy in restraint of commerce among the several States * * *."[10] Judge Aspen granted summary judgment for Fox Valley and permanently enjoined USTA from "preventing its members from racing at tracks which are not USTA members or have not paid USTA a specified fee." 487 F.Supp. at 1017. In support of his ruling, Judge Aspen found that the per se rule was appropriately applied to USTA's conduct, and that USTA could not avail itself of the narrow exception to the per se rule created by Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389. We consider each of these propositions in turn.
 
 
 23
 "(T)he rule of reason (is) the standard traditionally applied for the majority of anticompetitive practices challenged under § 1 of the Act." Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 59, 97 S.Ct. 2549, 2562, 53 L.Ed.2d 568. In certain instances the detailed factual inquiry into actual anticompetitive effect that is characteristic of the rule of reason is supplanted by a per se rule. But "(a) particular course of conduct will generally be termed a per se violation of the Act only after courts have had considerable experience with the type of conduct challenged and application of the Rule of Reason has inevitably resulted in a finding of anticompetitive effects." Havoco of America, Ltd. v. Shell Oil Co., 626 F.2d 549, 555 (7th Cir. 1980).
 
 
 24
 The Supreme Court has found certain group boycotts per se illegal. See, e.g., Fashion Originators' Guild of America, Inc. v. FTC, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (organization of dress manufacturers and fabric designers boycotted retailers and manufacturers who dealt in copies of original designs or refused to promise not to deal in such copies); Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (retailers combined with appliance manufacturers and distributors to boycott competing retailer). As Smith v. Pro Football, Inc., 593 F.2d 1173, 1178 (D.C.Cir.1978) notes, the common attribute of per se illegal boycotts is "a concerted attempt by a group of competitors at one level to protect itself from competition from non-group members who seek to compete at that level."[11]
 
 
 25
 As Smith also teaches, however, "(A per se rule) should not be applied, and has never been applied by the Supreme Court, to concerted refusals that are not designed to drive out competitors but to achieve some other goal." 593 F.2d at 1180. See also Cullum Electrical & Mechanical, Inc. v. Mechanical Contractors of South Carolina, 436 F.Supp. 418, 430 (D.S.C.1976), affirmed, 569 F.2d 821 (4th Cir. 1978), certiorari denied, 439 U.S. 910, 99 S.Ct. 277, 58 L.Ed.2d 255. The danger of rote application of the per se rule to all conduct that can be called a "group boycott" is that the sound teachings of experience will be extended into new and unfamiliar areas, where they have no proper application.
 
 
 26
 "The term 'group boycott' * * * is in reality a very broad label for divergent types of concerted activity. To outlaw certain types of business conduct merely by attaching the 'group boycott' and 'per se' labels obviously invites the chance that certain types of reasonable concerted activity will be proscribed." Mackey v. National Football League, 543 F.2d 606, 619 (8th Cir. 1976), certiorari dismissed, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59, quoting with approval Worthen Bank & Trust Co. v. National BankAmericard Inc., 485 F.2d 119, 125 (8th Cir. 1973), certiorari denied, 415 U.S. 918, 94 S.Ct. 1417, 39 L.Ed.2d 473.
 
 
 27
 Here the attributes of per se invalidity discernible in Klor's and Fashion Originators' Guild are not present. There is concerted activity only in the sense that USTA is a membership organization enforcing rules contained in its by-laws. There is no showing of a purpose to exclude competitors. At the most obvious level, Fox Valley had no intention of setting up an organization to rival USTA, and USTA was not Fox Valley's competitor in the business of organizing harness race meetings. There is no indication either of any subtler scheme, as for example groups of drivers or owners using USTA as a means to eliminate other drivers or owners, or certain tracks combining behind the facade of USTA to drive Fox Valley out of business. There is a strong showing, to the contrary, that USTA was organized to ensure honest harness racing rather than to impose a "naked restraint of trade with no purpose except stifling of competition." White Motor Co. v. United States, 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738. Since "(p)er se rules of illegality are appropriate only when they relate to conduct that is manifestly anticompetitive," Sylvania, supra, 433 U.S. at 49-50, 97 S.Ct. at 2557, USTA was entitled to have the effects of its application of Rules 5 and 17 evaluated under the rule of reason. Accord, Gunter Harz Sports, Inc. v. U.S. Tennis Ass'n, 511 F.Supp. 1103, 1115 (D.Neb.1981) (as "non-profit sanctioning organization" that "(did) not compete at any level with the plaintiff as a manufacturer or distributor of tennis rackets or stringing systems," United States Tennis Association should have rule banning double-strung rackets examined under rule of reason rather than per se doctrine of Fashion Originators' Guild and Klor's ).
 
 
 28
 Nor have the courts had the kind of experience with organizations like USTA that would warrant extending the per se rule to this case. Except in the rare instances where conduct is unambiguously anticompetitive,[12] this lack of experience should lead us to inquire into the nature and idiosyncracies of a particular enterprise before we assign a label to its conduct. One indication of the inconcinnity between the state of our knowledge and the certitude of the per se rule is the extent to which the rule minimizes USTA's free-rider problems.[13] If Fox Valley can enjoy the benefits of affiliation with USTA and pay nothing, or pay only when a court orders it to do so, it has no incentive to do otherwise. And it can count on the breadth of USTA membership and on the relationship between USTA and state racing boards to keep USTA afloat for some time despite its (and other tracks') free-riding attempts. In treating USTA's efforts to forestall this result as per se violative of the Sherman Act, the district court forecloses all justifications USTA might make, perhaps without achieving any procompetitive result.
 
 
 29
 There is a second, independent basis for our holding that USTA's conduct should have been evaluated under the rule of reason. While defendants rely on Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389, in support of their argument that the per se rule should apply here, that opinion reserved rule of reason treatment for group boycotts whose "justification derived from the policy of another statute or otherwise" (348-349, 83 S.Ct. at 1252).[14] Judge Aspen recognized the applicability of the Silver exception, but gave it an extremely narrow reading. 487 F.Supp. at 1015-1016. Many lower federal courts have been less restrictive. There is now a considerable body of law, derived more or less proximately from Silver, recognizing that in certain self-regulatory contexts binding rules must be developed to safeguard the enterprise's viability, and that application of a per se standard of illegality to such endeavors is improper. Post-Silver court of appeals decisions have frequently acknowledged that in organized sports "interdependence," "cooperation," and at least "a few rules are essential to survival," and have often eschewed per se analysis in passing upon antitrust challenges to such rules. Hatley v. American Quarter Horse Ass'n, 552 F.2d 646, 652 (5th Cir. 1977) (per se rule inapplicable to Association registration rule), citing with approval Bridge Corporation of America v. American Contract Bridge League, Inc., 428 F.2d 1365 (9th Cir. 1970), certiorari denied, 401 U.S. 940, 91 S.Ct. 940, 28 L.Ed.2d 220 (per se rule inapplicable to ACBL refusal to sanction local tournament); Deesen v. Professional Golfers' Association, 358 F.2d 165 (9th Cir. 1966), certiorari denied, 385 U.S. 846, 87 S.Ct. 72, 17 L.Ed.2d 76 (rule of reason applicable to PGA tournament entry restrictions). See also Neeld v. National Hockey League, 594 F.2d 1297, 1299 n. 4 (9th Cir. 1979) (per se rule inapplicable to NHL player eligibility rule); Smith v. Pro Football, Inc., supra, 593 F.2d at 1182 and n. 37 (legality of NFL draft not governed by per se rule); Mackey v. National Football League, supra, 543 F.2d 606, 618-620 (per se rule inapplicable to NFL "Rozelle rule"); Gunter Harz Sports, Inc. v. U.S. Tennis Ass'n, supra, 511 F.Supp. at 1116 (per se rule inapplicable to ban on double-strung tennis rackets). Cf. Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc., 351 F.Supp. 462, 503-504 (E.D.Pa.1972) (in suit for preliminary injunction, per se rule inapplicable to NHL reserve clause; per se rule probably inapplicable at trial on merits as well). These cases provide support for the proposition that, in the context of organized sports and sanctioning organizations, courts should be hesitant to fasten upon tags such as "group boycott" and "per se " in order to preclude inquiry into the business necessity for or precise harm occasioned by particular rules or practices. This proposition is in no sense undercut, as the dissent argues, by the Court's opinion in National Society of Professional Engineers v. United States, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637. Courts have not allowed "the Rule of Reason (to) support a defense based on the assumption that competition itself is unreasonable," 435 U.S. at 696, 98 S.Ct. at 1368, and we permit no such defense here. We merely require that the trial court must find rather than presume harm to competition.
 
 
 30
 In summary USTA's efforts to apply its Rules 5 and 17 should be tested under the rule of reason, either because sporting activities and organizations are entitled to a fuller form of antitrust analysis in recognition of their need for self-regulation, or because the conduct at issue here is not within the undeniably anticompetitive per se boycott paradigm. As we recently stated in Lektro-Vend Corporation v. The Vendo Company, 660 F.2d 255, 268 (7th Cir. 1981):
 
 
 31
 It is by now well established that any rule of reason analysis requires a showing of anticompetitive market effect. To hold otherwise would ignore the very purpose of the antitrust laws which were enacted for the protection of competition, not competitors.
 
 
 32
 See also Quality Auto Body, Inc. v. Allstate Insurance Company, 660 F.2d 1195, 1203 (7th Cir. 1981). Thus our cases consistently hold that a plaintiff or counterclaimant must prove adverse impact in the relevant market to establish a Section 1 rule of reason violation (id. ). As in Lektro-Vend, USTA may be able to prove that it "had a right to restrain in order to protect its legitimate interests." 660 F.2d at 269. The question for the court on remand will be whether the challenged conduct "went beyond the level of restraint reasonably necessary to accomplish whatever legitimate business purpose might be asserted for it." Smith, supra, 593 F.2d at 1183.
 
 
 33
 IV. Fox Valley's Claim of Tortious Interference with
 
 Contract and Business Relations
 
 34
 Count II of Fox Valley's counterclaim and supplemental counterclaim alleged that USTA's letters to its members,[15] warning that racing information would not be supplied to or recorded from Fox Valley and that Rules 5 and 17 would in future be enforced, amounted to tortious interference with the contract and business relations existing between Fox Valley and the Illinois Harness Horsemen's Association.[16] The district court granted summary judgment for Fox Valley on Count II, but the decision must be reversed and remanded.
 
 
 35
 As Judge Aspen noted, the elements of a tortious interference claim are:
 
 
 36
 the existence of a valid business relationship (not necessarily evidenced by an enforceable-contract) or expectancy; knowledge of the relationship or expectancy on the part of the interferer; an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and resultant damage to the party whose relationship or expectancy has been disrupted.
 
 
 37
 487 F.Supp. at 1017, quoting City of Rock Falls v. Chicago Title and Trust Co., 13 Ill.App.3d 359, 363, 300 N.E.2d 331, 333 (3d Dist. 1973). Two of the elements of the cause of action are missing in Judge Aspen's analysis. First, the record does not show that USTA knew about an IHHA agreement with Fox Valley. Judge Aspen assumed knowledge based on the two letters USTA had mailed its members in April 1977 (487 F.Supp. at 1011-1012, 1017), but the letters make no reference to any IHHA agreement with defendant tracks (App. 318-319). Moreover, the scope of the mailings is unclear, but even a high correlation between IHHA members and the addressees of the letters would not be probative. As noted earlier, all IHHA members are also USTA members, and USTA needed to inform its members who might participate in meetings at Fox Valley that the track had not affiliated with USTA. Second, Fox Valley has shown no damage, because USTA has been enjoined since 1977 from applying its rules to members who participate in Fox Valley's race meetings. Illinois Harness Horsemen's Association v. United States Trotting Association, No. 77 C 3014 (N.D.Ill., August 29, 1977). Judge Aspen concentrated, however, on the supposed invalidity of USTA's affirmative defenses. He denied that USTA could be protecting its own economic interest in the eligibility certificates, because he held that it had no such interest. Nor could USTA be enforcing its pre-existing contractual right to forbid its members to present eligibility certificates at non-affiliated tracks, because the contract term conduced to a boycott and the boycott, he ruled, was a per se violation of the Sherman Act. Since we hold that USTA has shown ownership of the eligibility certificates and that no per se violation of the antitrust laws has been demonstrated, the district court's grant of summary judgment to Fox Valley on this claim was also improper.
 
 
 38
 Reversed and remanded for further proceedings consistent herewith; costs to appellant.[17]
 
 
 39
 CUDAHY, Circuit Judge, concurring in part, dissenting in part:
 
 
 40
 I agree that, with respect to the misappropriation claims, summary judgment in favor of defendants must be reversed. I do not agree, however, that USTA is entitled to summary judgment in its favor with regard to the eligibility certificates. "An essential predicate of the USTA's misappropriation claim is proof of its ownership of the certificate in question, or, more precisely, the information contained on those certificates." U.S. Trotting Ass'n v. Chicago Downs Ass'n, Inc., 487 F.Supp. 1008, 1012 (N.D.Ill.1980). While I accept the majority's conclusion that the presence of USTA's proprietary legend tends to "rebut the presumption that ownership of the eligibility certificates rested with the horsemen who happened to possess them," ante at 786, I believe that factual issues remain as to both the ownership and the nature of the property allegedly misappropriated.
 
 
 41
 It is well established that USTA has a protectible property interest in the information contained on the eligibility certificates only if that information was acquired as "the result of organization and the expenditure of (USTA) labor, skill and money." Int'l News Service v. Associated Press, 248 U.S. 215, 239, 39 S.Ct. 68, 72, 63 L.Ed. 211 (1918). See Data Cash Systems, Inc. v. JS&A Group, Inc., 480 F.Supp. 1063, 1070-71 (N.D.Ill.1979), aff'd on other grounds, 628 F.2d 1038 (7th Cir. 1980). According to the depositions of USTA officials, however, the information on the certificates is supplied by racetrack employees who are not paid by USTA. Dep. of Kevin Fergus, USTA Assistant Treasurer, at 6-7; Dep. of Albert Buongiorne, USTA Program Dept., at 27-28. Moreover, during the 1977 racing season, when USTA contends that Fox Valley and Chicago Downs misappropriated its property, none of the officials recording information on the certificates at the Fox Valley meets were employed by USTA, nor were any USTA officials present to supervise the accuracy of Fox Valley's recording procedures. Dep. of Timothy Schwartz, Presiding Judge at Fox Valley, at 68.[1]
 
 
 42
 On the other hand, USTA claims a protectible property interest in the certificates by virtue of its centralized record-keeping system and its consequent ability to control the accuracy, and to police misuse, of the information supplied by racetracks. USTA also argues that all incidents of ownership of the certificates, including exclusive possession, would remain with USTA were it not for the Association's carefully circumscribed issuance of the certificate to member horseowners after submission and review of a proper application. In view of these competing factual considerations, I would remand this issue, together with the registration certificate claim, for trial.
 
 
 43
 In all other respects I concur in the majority opinion.
 
 
 44
 BAUER, Circuit Judge, dissenting.
 
 
 45
 I would affirm the judgment of the district court.
 
 
 46
 * I do not believe that USTA has proved in the district court, or in this court, that it owns the eligibility and registration certificates. The undisputed record reveals that the horse owners, not USTA, retain possession of the registration and eligibility certificates. In its cross-motion for summary judgment, USTA failed to advance evidence sufficient to rebut the presumption of ownership that arises from possession. Mori v. Chicago Nat'l Bank, 3 Ill.App.2d 49, 120 N.E.2d 567 (1954).
 
 
 47
 Horse owner members of USTA pay yearly membership dues of $20.00. They pay an additional fee of from $15.00 to $100.00 to register a horse, whereupon USTA issues a registration certificate to the owner. The owner retains possession of the certificate until the horse is sold, then the certificate passes to the new owner. At the time of sale, the new owner signs the certificate and returns it to USTA. USTA records the transfer in its permanent record and returns the certificate to the new owner who retains possession of it until any further transfer.
 
 
 48
 I agree with the district court that the registration certificate "seem(s) to function as something akin to a 'title,' at least insofar as 'it will be relied upon by purchasers and will pass from hand to hand with each change of ownership.' Howard v. National French Draft Horse Association, 169 Iowa 719, 730, 151 N.W. 1056 (1915)." 487 F.Supp. at 1013. USTA maintains permanent records of horse ownership and registration at its offices and issues the certificate to the owner, for a fee, for his sole use. USTA has failed to prove it owns the registration certificate. I see no reason to remand for further hearings on this issue.
 
 
 49
 Similarly, the horse owner retains sole possession of the eligibility certificate, which is issued annually for a fee of $5.00. He carries it with him from track to track. At the end of the racing season, the horse owner discards the eligibility certificate. In fact, the application for the certificate specifically admonishes members not to return the certificate to USTA.
 
 
 50
 USTA seeks to bolster its argument concerning ownership of the eligibility certificates by relying on the language printed on the face of the certificate which provides:
 
 
 51
 (t)his eligibility certificate and the information contained on it are the property of USTA and all rights to its use or reproduction are reserved by it.
 
 
 52
 In essence, USTA argues that it owns the eligibility certificate because it owns the information recorded on it.
 
 
 53
 USTA has a protectible property interest in the information contained on the certificate only if the information was acquired as "the result of organization and the expenditure of (USTA) labor, skill and money." Int'l News Service v. Associated Press, 248 U.S. 215, 239, 39 S.Ct. 68, 72, 63 L.Ed. 211 (1918). The record reveals unequivocally that the information on the certificate is supplied by racetrack employees who are not paid by USTA. USTA does not have any representative at any track observing the recording of information on the certificates to ensure accuracy.
 
 
 54
 Notwithstanding USTA's failure to expend its "labor, skill and money" in the acquisition and recording of the information on the certificate, USTA maintains that it owns the certificate because the information recorded on it is central to USTA's system of recordkeeping. The record reveals, however, that USTA's system of recordkeeping relies on the information it receives from the tracks on the Judge's Sheets. USTA could not rely on the information recorded on the eligibility certificate because USTA never sees the certificate after it is issued to the horse owner. Like the district court, I remain "unconvinced, however, that the term 'ownership' properly characterizes USTA's regulatory interest in the information contained in the certificate." 487 F.Supp. at 1013 (footnote omitted).
 
 
 55
 The statement on the face of the certificate purporting to identify USTA's ownership of the information and the certificate does not aid USTA in establishing its claim of ownership, for, as the district court found, the "expression of ownership is negated by the adhesive nature of the contract between horsemen and USTA." Id. at 1014. Illinois law requires that all horses racing on Illinois tracks must have eligibility certificates issued by USTA. Ill. Racing Bd. Rule 9.01. USTA will issue an eligibility certificate only if the horse owner is a USTA member. Horse owners applying for USTA membership in order to purchase eligibility certificates are in no position to bargain over the expression of USTA ownership contained on the certificate. "As a result, this provision on the eligibility certificate provides no basis for deciding that USTA owns those certificates." 487 F.Supp. at 1014 (footnote omitted).
 
 
 56
 The undisputed evidence in the record supports the district court's conclusion that USTA does not own the certificates and, therefore, lacks a protectible interest in them. Accordingly, I would affirm the district court order granting defendants-appellees' motion for summary judgment on USTA's misappropriation claim.
 
 II
 
 57
 The majority contends that the rule of reason, rather than the per se boycott rule, is the proper standard of analysis for this case. I disagree.
 
 
 58
 First, the majority claims that the district court erred in failing to review USTA's conduct pursuant to the rule of reason because courts lack sufficient experience with sporting associations to conclude that their restrictive membership rules are per se unlawful. The majority, however, misapprehends the nature of a court's inquiry. The issue is not whether the courts have sufficient experience with the defendant's type of business. Rather, in determining whether a per se rule applies, the relevant inquiry is limited to ascertaining whether the courts have sufficient experience with the type of restraint to decide that the practice has a "pernicious effect on competition" and lacks "any redeeming virtue." Northern Pac. R. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). The courts clearly have the requisite experience with group boycotts to hold that they are per se unlawful. See, e. g., Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) (wholesaler and retailer combination); Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945) (newsgathering association); AMA v. United States, 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434 (1943) (professional association); Fashion Originators' Guild v. FTC, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941) (trade union); Paramount Famous Lasky Corp. v. United States, 282 U.S. 30, 51 S.Ct. 42, 75 L.Ed. 145 (1930) (movie industry).
 
 
 59
 The majority next argues that the per se rule does not apply in this case because the concerted refusal to deal was not directed at USTA's horizontal competitor. This definition of "group boycott" is far too restrictive. Group boycott "refers to a method of pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target." St. Paul Fire & Marine Ins. Co. v. Barry, 438 U.S. 531, 541, 98 S.Ct. 2923, 2930, 57 L.Ed.2d 932 (1978). Concerted refusals to deal directed at noncompetitors are included within the definition of "group boycotts." Id. at 543, 98 S.Ct. at 2930; Paramount Famous Lasky Corp. v. United States, 282 U.S. 30, 51 S.Ct. 42, 75 L.Ed. 145 (1930).
 
 
 60
 Finally, the majority contends that the district court should have applied the rule of reason because USTA's conduct was exempted from per se analysis by Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963). The Supreme Court indicated in Silver that the stock exchange boycott was exempted from a finding of per se violation only because another federal statute authorized industry self-regulation. 373 U.S. at 364, 83 S.Ct. at 1260. When the Court stated that the per se boycott rule would not apply if there was a justification for the restraint "derived from the policy of another statute or otherwise," id. at 348-49, 83 S.Ct. at 1252, it could not have been referring to a justification derived from a need for industry self-regulation.
 
 
 61
 The early cases also foreclose the argument that because of the special characteristics of a particular industry, monopolistic arrangements will better promote trade and commerce than competition .... That kind of argument is properly addressed to Congress and may justify an exemption from the statute for specific industries, but it is not permitted by the Rule of Reason.
 
 
 62
 Nat'l Soc'y of Professional Eng'rs v. United States, 435 U.S. 679, 689-90, 98 S.Ct. 1355, 1364, 55 L.Ed.2d 637 (1978) (citations and footnote omitted). See also Fashion Originators' Guild of America, Inc. v. FTC, 312 U.S. 457, 465, 61 S.Ct. 703, 706, 85 L.Ed. 949 (1941).
 
 
 63
 USTA informed its member horse owners and drivers that it would enforce its sanctions against them if they participated in the Fox Valley meet. If the district court had not enjoined USTA from enforcing its rules, Fox Valley would have been forced to accede to USTA's request that it become a member or an affiliate or risk not having a field of competitors. This is precisely the type of group enlisted pressure that the Supreme Court included within the definition of "boycott" set forth in St. Paul Fire & Marine Ins. Co. v. Barry, 438 U.S. 531, 541, 543, 544-45, 98 S.Ct. 2923, 2929, 2930, 2931-32, 57 L.Ed.2d 932 (1978). I agree with the district court that USTA's conduct in adopting these rules and in informing its members in July 1977 that it intended to sanction members participating in the Fox Valley meet was a group boycott and, therefore, was per se violative of the Sherman Act.
 
 III
 
 64
 Count II of Fox Valley's counterclaim alleged that USTA's boycott tortiously interfered with the contract and business relations existing between Fox Valley and the Illinois Harness Horsemen's Association. I agree with the majority that USTA's actions did not harm Fox Valley because the district court's injunction prevented USTA from proceeding as planned. I would not order the district court to lift the injunction, however, because I believe that USTA has tortiously interfered with the business relationship between Fox Valley and the IHHA.
 
 
 65
 The district court could reasonably infer from the two letters that USTA mailed to member horsemen that USTA knew of the agreement between Fox Valley and the IHHA. USTA claims that it informed the horsemen of its intention to invoke the sanction of its restrictive membership rules in order to preserve the integrity of its records system, "not on a malicious desire to interfere with Fox Valley's business arrangements." Appellants' br. at 47-48 (footnotes omitted). Although USTA may have invoked the boycott of Fox Valley in order to preserve the integrity of its records system, its conduct was not justified because USTA had no interest in the certificates to protect. Its conduct was nothing more than a naked restraint of trade to induce its member horsemen to breach their contract with Fox Valley by not racing in the Fox Valley meet.
 
 IV
 
 66
 For the reasons stated in this opinion, I would affirm the judgment of the district court. Accordingly, I dissent.
 
 
 
 [1]
 IHHA was joined as a party defendant and filed a brief here favoring affirmance. It is described in Count II of Fox Valley's counterclaim as "the representative of all owners, trainers and drivers participating in harness racing at Sportsman's Park." IHHA's answer to USTA's amended complaint states further that it represents "all owners, trainers and drivers participating in harness racing in Illinois" and that "(a)ll members of IHHA ... are also members of USTA." It is not a competitor of USTA
 
 
 [2]
 The National Association of State Racing Commissioners, the Canadian Trotting Association, the Kentucky Harness Racing Commission, the Michigan Harness Horsemen's Association, and the Northeastern Harness Horsemen Association. They have asserted that USTA's records and services are vital to the integrity of this sport
 
 
 [3]
 Membership in USTA is open to horseowners, breeders, drivers, track officials, state racing officials, and organizations that sponsor harness race meetings, whether parimutuel or not. Management organizations, like Fox Valley and Chicago Downs, that sponsor race meetings at tracks are considered "race tracks" and may join USTA as members or affiliate as contract tracks
 
 
 [4]
 In 1976 both defendants paid USTA for its services. Since the commencement of this litigation, USTA has been enjoined from enforcing its by-laws to obtain payment, and the defendants have deposited with the court the amounts that may be found to be due USTA
 
 
 [5]
 Letters from William R. Hilliard, Secretary of USTA, dated 1 July 1977 (Chicago Downs), 8 July 1977 (Fox Valley), 6 April 1978 (Fox Valley), 9 May 1979 (Fox Valley). See App. 318-321
 
 
 [6]
 The eligibility certificates also bear at the top and bottom the legend " CR The United States Trotting Association 1960." For the first time on appeal defendants argue that if the information on the eligibility certificates is copyrightable, then any state-law misappropriation claim is pre-empted by federal copyright law. On the other hand, if the information is not copyrightable, defendants assert that USTA has violated 17 U.S.C. § 506(c), which makes it a crime to place a notice of copyright on a work with intent to deceive. (Br. 29-32)
 There are short answers to defendants' arguments. First the legend refers to the form itself, which contains sufficient indicia of creative authorship to be copyrightable. See the recent statement of Copyright Office policy and summary of case law at 45 Fed.Reg. 63297 (Sept. 24, 1980). Second USTA does not claim copyright protection-and as a practical matter could not do so-for each new item of information that is entered on the certificates in the course of a racing season. Rather it argues that the certificates are its property, which defendants have tortiously taken. Third USTA could, and apparently does, claim copyright protection for the compilations of information it makes itself. See Schroeder v. William Morrow & Co., 566 F.2d 3 (7th Cir. 1977). That is the point of the reference in Art. VII, § 7(c) of its by-laws: "The Association shall be obligated to furnish to non-member (contract) tracks its copyrighted performance and other data." USTA does not claim that defendants are infringing its copyright in that material. Thus USTA's misappropriation claim is not preempted by, because it does not fall within the realm of, federal copyright law. 17 U.S.C. § 301(b)(3). Contrast Harper & Row Publishers v. Nation Enterprises, 501 F.Supp. 848, 851-854 (S.D.N.Y.1980).
 
 
 [7]
 In a related case, Judge McGarr refused to hold that the USTA eligibility certificates were the property of the individual horsemen. Illinois Harness Horsemen's Association v. United States Trotting Association, No. 77 C 3014 (N.D.Ill. August 29, 1977), Tr. 25
 
 
 [8]
 The amicus brief of the Michigan Harness Horsemen's Association at 5 notes that in most States the government does in fact own registration certificates and instances Mich. CLA 257.259(a) as typical legislation
 
 
 [9]
 We do not agree with the position taken in the partial dissent, pages 791-792 infra, that factual issues remain to be resolved as to both types of certificates. The language on the eligibility certificates, if (as we hold) it is not tainted by adhesion, is a clear statement of ownership. Furthermore, although the officials who enter performance information on the eligibility certificates are racetrack employees, they are also all licensed by USTA. Most important, the information gleaned from performances at individual tracks is relatively useless. When the tracks use eligibility certificates to schedule balanced and competitive races, they are relying on the accuracy of data recorded at other race meetings by other USTA-licensed officials. Only USTA is in a position to collect all the data and police its misuse. The tracks have relied on the doctrine of International News Service v. Associated Press, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 and argued that they provide the organization, labor, skill and money to gather the performance information. In fact they contribute little or nothing to the aggregation of information, and it is the aggregation that they need and have misappropriated
 
 
 [10]
 Although the counterclaim also cited Section 2 of the Sherman Act (15 U.S.C. § 2), Fox Valley has not relied on that provision in this Court
 
 
 [11]
 St. Paul Fire & Marine Insurance Co. v. Barry, 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932, on which the dissent relies, is not contra. There the Court was construing the term "boycott" in Section 3(b) of the McCarran-Ferguson Act. It relied on Sherman Act case law in formulating its general definition:
 We hold that the term "boycott" is not limited to concerted activity against insurance companies or agents or, more generally, against competitors of members of the boycotting group. 438 U.S. at 552, 98 S.Ct. at 2935.
 The Court made clear, however, that "the issue before us is whether the conduct in question involves a boycott, not whether it is per se unreasonable." Id. at 542, 98 S.Ct. at 2930. We face precisely the question the Supreme Court did not reach-namely when conduct within the generic definition of a boycott is treated as conclusively illegal and when its anticompetitive effects may be inquired into.
 
 
 [12]
 The cases cited by the dissent, page 794 infra, are illustrative. Some of them antedate the per se rule's application to boycotts, but all of them involve conduct that can only be anticompetitive. The list includes: cartelization to require acceptance of a standard form contract (Paramount Famous Lasky Corp. v. United States, 282 U.S. 30, 51 S.Ct. 42, 75 L.Ed. 145); efforts to force hospitals not to deal with doctors who participate in prepaid medical programs (AMA v. United States, 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434); newsgathering association by-laws that countenance vetoes by established members of applications by their rivals and ban sales of news to nonmembers (Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013)
 
 
 [13]
 The Supreme Court first gave free-riding serious attention in the Sylvania case, supra, 433 U.S. at 54-57, 97 S.Ct. at 2559-2561. On the dimensions of the problem in the antitrust context, see Posner, The Rule of Reason and the Economic Approach: Reflections on the Sylvania Decision, 45 U.Chi.L.Rev. 1, 6-10 (1977)
 
 
 [14]
 The exception was recognized in McCreery Angus Farms v. American Angus Ass'n, 379 F.Supp. 1008, 1018 (S.D.Ill.1974), affirmed by unreported order (506 F.2d 1404 (7th Cir. 1974))
 
 
 [15]
 See note 5 supra
 
 
 [16]
 See note 1 supra
 
 
 [17]
 Circuit Rule 18 shall govern
 
 
 [1]
 The majority attempts to deny the significance of these facts by arguing that "the information gleaned from performances at individual tracks is relatively useless," ante at 787 n. 9, and asserting that it is the aggregation of that information that defendants have misappropriated. Even accepting the validity of this analysis, however, summary judgment in favor of USTA is unjustified. The record indicates that aside from its licensing authority, USTA plays virtually no role in aggregating the information relied upon by the defendant race tracks. Rather, this information-supplied by individual track employees-is aggregated on the eligibility certificates themselves, which remain in the possession of the horseowners throughout the racing season. USTA merely receives copies of the information entered on the certificates after each race; neither those copies, nor any USTA-supplied aggregation of the information they contain, are used by the defendant race tracks during the racing season. Certainly, factual issues are inherent in this method of doing business