The UNITED STATES TROTTING ASSOCIATION, an Ohio non-profit corporation, Plaintiff,

v.

CHICAGO DOWNS ASSOCIATION, INC., an Illinois Corporation, Defendant.

The UNITED STATES TROTTING ASSOCIATION, an Ohio non-profit corporation, Plaintiff,

v.

FOX VALLEY TROTTING CLUB, INC., an Illinois Corporation, Defendant (two cases).

Nos. 77 C 3312, 77 C 3313 and 78 C 1258.

United States District Court, N. D. Illinois, E. D.

March 18, 1980.

---

Donald A. O'Brien, James W. Hathaway, Arnold Kanter, Burditt & Calkins, Chicago, Ill., A. Vernon Carnahan, Donovan, Leisure, Newton & Irvine, New York City, for plaintiffs.

Thomas D. Nash, Jr., Robert M. Ahern, Nash, Ahern & McNally, Chicago, Ill., Dominic H. Frinzi, Stillo & Demeo, Milwaukee, Wis., Thomas P. Sullivan, U. S. Atty., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

United States Trotting Association (USTA) has brought these actions seeking injunctive relief, an accounting, and punitive damages against defendant race tracks Fox Valley Trotting Club, Inc. ("Fox Valley") and Chicago Downs Association, Inc. ("Chicago Downs") for alleged misappropriation of USTA's property.[1] The defendants

---

1. There are six additional related actions between USTA and non-USTA-affiliated race tracts presently pending before this Court. *Fox Valley Trotting Club v. The United States Trotting Association*, Civil Case No. 77 C 2920; *Illinois Harness Horsemen's Association v. The United States Trotting Association*, Civil Case No. 77 C 3014; *The United States Trotting Association v. Suburban Downs, Inc.*, Civil Case No. 78 C 5157; *The United States Trot-* *ting Association v. Washington Park Harness Race Track Corporation*, Civil Case No. 79 C 5113; *The United States Trotting Association v. Cloverleaf Racing Park, Inc.*, Civil Case No. 79 C 5114; and *The United States Trotting Association v. Egyptian Trotting Association, Inc.*, Civil Case No. 79 C 5207. A seventh action involves USTA's relationship with a member track. *The United States Trotting Association v. Maywood Park Trotting Associa-*

have counterclaimed for injunctive relief against USTA for its alleged involvement in a group boycott in violation of the Sherman Act, 15 U.S.C. § 1. In addition, defendants have alleged that USTA has committed the common law offense of tortious interference with the contractual relationships existing between the defendant race tracks and harness-racing horsemen.[2]

The relevant facts are as follows. USTA, an Ohio not-for-profit organization incorporated in 1939, is involved in the sport of harness racing. USTA's activities include the issuance of two certificates to the owners of harness racing horses. The registration certificate issued by USTA documents that a particular horse has been registered with the organization. The face of the certificate contains information concerning the animal's physical markings, pedigree, owner, and breeder. Subsequent sales of the horse are recorded on the reverse side of the certificate. At the time of sale, the new owner signs the registration certificate and then sends it to USTA. There, the USTA Registrar records the transfer, signs the certificate, and returns it to the new owner, who retains possession thereof.

USTA also issues an annual eligibility certificate. This certificate records pertinent performance information compiled from the horse's last eight starts in the prior racing season. This information is obtained by the USTA from the "Judges Book," which is a record maintained by USTA-licensed employees of the various race tracks. During the harness racing season, owners who wish to enter horses in races at a particular track must present the eligibility certificate—as well as the registration certificate—to the clerk of the course. At the conclusion of the race, the clerk records on the eligibility certificate the horse's performance in each race it has entered.[3] As the horse travels from track to track throughout the racing season, track officials utilize the information on the eligibility certificates to determine whether the horse first must run a qualifying race in order to compete in a purse race and whether it is competitive with the others in the field. The horse's performance in its previous race is determined from the eligibility certificate and the accuracy of the information contained in the track's racing programs sold to the public is verified from certificate. The eligibility certificate remains in the possession of the owner throughout the season. Moreover, the compilation of information during the racing season is done by employees of the respective tracks, not by USTA officials. Thus, USTA has no direct knowledge of what has been recorded on those certificates by the respective tracks. When the certificate expires at the conclusion of the racing season, the owner does not return it to USTA.[4] It is generally destroyed.

In 1939, the time of USTA's inception, Illinois maintained no state scheme for the regulation of harness racing. As a result, USTA assumed extensive control over virtually all aspects of the sport. In 1945, however, the State of Illinois enacted legislation regulating harness racing. As a result, pari-mutuel betting on harness racing in Illinois has blossomed into a substantial business, as well as a significant source of tax revenues.[5] The state has recognized the need to maintain integrity in the conduct of harness racing through the enact-

_tion_, Civil Case No. 79 C 5037. For a brief description of the nature of these actions, _see_ note 17 herein.

2. The term "horsemen" as used in this opinion includes horse owners, drivers, trainers, agents, stable foremen, veterinarians, race track operator employees, blacksmiths, and grooms.

3. On a separate form, the clerk transcribes and forwards the race results and submits it to the USTA for central storage.

4. Indeed, the application for the eligibility certificate expressly states: "DO NOT return last year's Certificate if you plan to race in January." (emphasis original).

5. In 1977, Illinois collected more than $33 million in tax revenues from harness racing. _See_ 1977 Annual Report of the Illinois Racing Board at 62–63.

ment of an elaborate statutory scheme.[6] Moreover, the state has enlisted USTA as a partner in the regulation of harness racing. State law requires that harness race horses be registered with USTA.[7] The rules of the Illinois Racing Board—a state administrative agency [8]—also require that all horses which enter harness races possess a USTA eligibility certificate.[9] Thus, through these record-keeping functions, USTA continues to perform an integral role in ensuring the integrity of harness racing.

There is no state statute or regulation which requires that horse owners or race tracks obtain membership in USTA; the state merely mandates that harness racing horses possess USTA registration and eligibility certificates. USTA rules, however, provide that only owners who are members of USTA may obtain registration and eligibility certificates for their horses.[10] In addition, USTA rules prohibit organization members from racing horses at tracks which neither belong to USTA nor have entered into a services contract with the organization.[11] Members who violate this prohibition are subject to having their eligibility certificates revoked, and may be pre-

cluded from obtaining certificates for future racing seasons.[12] USTA rules also provide for a $100 fine against USTA-member harness racing drivers who run horses at non-affiliated tracks.[13] Membership in or contractual affiliation with USTA, therefore, is a practical necessity if race tracks are to have USTA-sanctioned horses run at their tracks.

It is this latter requirement that gives rise to the instant litigation. Chicago Downs and Fox Valley both are tracks licensed by the Illinois Racing Board to conduct harness racing meets. During the 1975 and 1977 seasons,[14] both tracks declined membership in or affiliation with USTA on the ground that the services provided were not commensurate with the fees charged.[15] Nonetheless, these tracks continued to hold races with USTA-registered horses, and continued to utilize the information contained on the registration and eligibility certificates. The tracks also provided USTA with the required information concerning each horse's performance in the races entered.

On July 1 and July 8, 1977, USTA in correspondence with its members indicated

---

**6.** See Illinois Horse Racing Act of 1975, Ill.Rev. Stat. (1977), Ch. 8, § 1 *et seq.*

**7.** Ill.Rev.Stat. (1977), Ch. 8, § 37–3.06(c) provides in relevant part:
"Harness horse racing" means the form of horse racing in which each participating horse is a Harness . . . horse, registered as such with and meeting the requirements of and approved by the United States Trotting Association . . .

**8.** See Ill.Rev.Stat. (1977), Ch. 8, § 37–2.

**9.** Illinois Racing Board Rule 9.01 provides in relevant part:
No horse shall be declared in without first possessing a current USTA . . . eligibility certificate at the gait the horse is declared to race.

**10.** USTA Rule 26, § 1; USTA Rule 9, § 3(a).

**11.** The eligibility certificate application provides:
I agree that if an eligibility certificate is issued by USTA on the basis of this application, I will present it only to tracks in membership with USTA or which have contracted with USTA for use of such certificates.

**12.** USTA Rule 5, § 1 provides in relevant part:
Horses racing . . . on tracks which are not in contract or which are not in membership with the United States Trotting Association . . . shall from the date of the first such race be ineligible to race in anything but a free-for-all, and he is barred from classified and claiming and conditioned races and no eligibility certificate will be issued on that horse in the future.

**13.** USTA Rule 17, § 5 provides in relevant part:
Any licensed driver who shall participate in a meeting or drive a horse at a meeting not in membership with this Association . . . shall be fined not to exceed $100 for each such offense . . .

**14.** During the 1976 racing season, both Fox Valley and Chicago Downs were in compliance with the membership agreements.

**15.** USTA Article I, § 4 provides a schedule of dues for member tracks, based on the number and gross proceeds of races run in any one year. Under USTA Article VII, § 7(c), tracks affiliated with USTA by contract pay the same fees as to member tracks.

its intent to enforce strictly the USTA sanctions for participation at unaffiliated tracks. Specifically, USTA stated that it would enforce the sanctions against members who participated in the racing season at Fox Valley scheduled to begin September 3, 1977, unless Fox Valley by that time had obtained USTA affiliation. Shortly thereafter, USTA instituted the three instant legal actions.

In 77 C 3312, USTA alleges that Chicago Downs' use of the certificates during three harness racing seasons in 1975 and 1977 constitute misappropriation of USTA property. In 77 C 3313, USTA makes the same allegation against Fox Valley with respect to two racing seasons in 1975 and 1977. USTA filed 78 C 1258 against Fox Valley in an attempt to restrain it from using the certificates in the races scheduled for the 1978 season. In all three actions, the defendant tracks have filed counterclaims alleging antitrust violations and tortious interference with the contract between the horsemen and the tracks.[16] On defendants' motion, a preliminary injunction has issued prohibiting USTA from enforcing its sanctions against members who would participate in races at Chicago Downs and Fox Valley. As a condition of this preliminary relief, Fox Valley has deposited $23,100 with the Court to cover its potential ultimate liability to USTA; Chicago Downs has $33,970 on deposit.[17]

16. The defendant tracks in June, 1974, entered into a contract with the Illinois Harness Horsemen's Association to govern the horsemen's participation in races at the tracks for the period of 1974 through 1979. *See* Exhibit O to Complaint *in Fox Valley Trotting Club, Inc. v. United States Trotting Association,* Civil Case No. 77 C 2920.

17. Prior to the filing of these actions, Fox Valley had brought suit against USTA seeking to enjoin enforcement of the · sanctions against owners who would run their horses in the upcoming Fox Valley racing season. 77 C 2920. This action was consolidated with a suit by the Illinois Harness Horsemen's Association seeking to enjoin the enforcement of the sanctions. 77 C 3014. These suits raise the same contentions that are at issue in the instant litigation. On August 29, 1977, the Court enjoined USTA from enforcing its sanctions pending outcome of litigation, on condition that Fox Valley deposit $12,000 with the Court to cover potential damages. In a subsequent related case, USTA

The parties have filed motions under Fed. R.Civ.P. 56 for summary judgment on all issues raised in the pleadings. Inasmuch as the parties concede—and the record reflects—that there are no material factual issues remaining in dispute, the action is ripe for summary adjudication. *See Cedillo v. International Association of Bridge & Structural Iron Workers, Local Union No. 1,* 603 F.2d 7, 10–11 (7th Cir. 1979).

## I. MISAPPROPRIATION

■ An essential predicate of USTA's misappropriation claim is proof of its ownership of the certificates in question; or, more precisely, the information contained on those certificates. Ordinarily, possession follows ownership. I.L.P. Property § 7 at 286. Here, it is undisputed that the horse owners retain possession of the certificates once they are issued by USTA. This is prima facie evidence of ownership of the certificates by the horse owners. *Mori v. Chicago National Bank,* 3 Ill.App.2d 49, 120 N.E.2d 567 (1st Dist. 1954).

USTA offers two arguments in rebuttal. First, USTA notes that owners do not have unfettered control over the use of the certificates. There are penalties imposed upon owners who fail to report sales of horses to USTA and who submit false information

filed suit against Suburban Downs alleging misappropriation and tortious interference with the contractual agreement between USTA and the horsemen. 78 C 5157. In this case as well, USTA has been enjoined preliminarily from enforcing its sanctions; Suburban Downs has deposited with the Court $15,984 to cover any potential liability to USTA.

Three additional related cases involve the same issues as the Suburban Downs case: *USTA v. Washington Park,* 79 C 5113; *USTA v. Cloverleaf Park,* 79 C 5114; and *USTA v. Egyptian Downs,* 79 C 5207. There have been no motions in these cases to enjoin preliminarily USTA from enforcing its prohibition against racing at non-affiliate tracks.

Finally, *USTA v. Maywood Park,* 79 C 5037, involves a breach of contract suit for the alleged failure of Maywood Park to pay the fees due under the membership contract with USTA to which it is a signatory.

concerning registration documents. Moreover, if USTA determines that information on an outstanding registration is incorrect, that registration may be cancelled. Second, USTA submits that the importance of the registration certificate to the USTA scheme of record-keeping is strong evidence of its ownership interest in that certificate. Thus, USTA argues that the owners' possession of the registration certificate appropriately might be viewed as a bailment or agency, since the owners are the logical carriers of the records pertaining to the horses they own.

As USTA admits, however, its interest in the certificate and the information contained therein is limited to the maintenance of the integrity of its record-keeping system. Given the regulatory nature of USTA's interest—as conferred by Illinois law—the Court is not convinced that USTA may be said to "own" the registration certificate.[18] On the other hand, although USTA resists this characterization, the registration certificate does seem to function as something akin to a "title," at least insofar as "it will be relied upon by purchasers and will pass from hand to hand with each change of ownership." *Howard v. National French Draft Horse Association*, 169 Iowa 719, 730, 151 N.W. 1056, 1060 (1915). It is true that the instant situation is distinguishable from *Howard* in that USTA must record any transfer of the certificate before a new owner may obtain possession thereof. However, as in *Howard*, the certificate is of obvious importance to owners who wish to sell their animals,

since Illinois permits only USTA-registered horses to run in harness races. Moreover, the horse owners pay USTA a fee for issuance of the certificate. Whether or not the foregoing conclusively establishes that the horse owners are the rightful owners of the certificate is beside the point. The burden rests with USTA to prove its ownership rights in the certificate as part of its misappropriation claim. This it has failed to do.

Similarly, USTA has failed to carry its burden of proving ownership with respect to the eligibility certificate.[19] Here again, USTA emphasizes that the horse owners unquestioned possession of the eligibility certificate is subject to USTA rules and regulations. Moreover, USTA reiterates its overriding interest in the certificates as a means of ensuring the integrity and reliability of harness racing as evidence of its ownership interest. All the information contained on the certificates, however, is provided by tracks at which USTA-approved horses race. Nor does USTA pay the tracks for this information. Moreover, the owners pay USTA a fee in exchange for the certificate. USTA's position is that since it is the central "administrator and guardian" of the record-keeping system, it should be recognized as owner of the certificates. The Court remains unconvinced, however, that the term "ownership" properly characterizes USTA's regulatory interest in the information contained in the certificate.[20]

USTA seeks to bolster its ownership argument with respect to the eligibility certificate by pointing to the language on the eligibility certificate, which provides that

---

18. Perhaps it would be more apt to analogize USTA's interest to that of the state when it issues certificates of registration of motor vehicle ownership. The state—as does USTA herein—maintains a strong interest in the accuracy of those records. Yet, it cannot be said that the state, despite its undoubted interest, "owns" the title registration or the information contained therein.

19. USTA suggests that in the related case of *Illinois Harness Horsemen's Association v. USTA*, Civil Case No. 77 C 3014, Judge McGarr has determined that the eligibility certificate in fact is owned by USTA. Although USTA does not suggest that this ruling is binding as to the instant cases, it does argue that the opinion is

entitled to great weight. However, a *close* reading of the transcript of Judge McGarr's oral ruling does not reflect a determination of the ownership issue. Transcript of Proceedings at 34–37. Assuming *arguendo* that Judge McGarr's opinion is supportive of USTA's characterization of the eligibility certificate, it must be noted that Judge McGarr's decision was made in the context of an emergency motion for preliminary injunctive relief. Thus, it is safe to say that Judge McGarr did not benefit from a full presentation of the facts as has this Court.

20. *See* note 18, *supra*.

This eligibility certificate and the information contained on it are the property of USTA and all rights to its use or reproduction are reserved by it.

The Court, however, believes that this expression of ownership is negated by the adhesive nature of the contract between horsemen and USTA.

The courts have defined contracts of adhesion as those

prepared entirely by one party, and which, due to the disparity in bargaining power between the draftman and the second party, must be accepted or rejected by the second party on a 'take it or leave it' basis without opportunity for bargaining and under such conditions that the second party or 'adherer' cannot obtain the desired product or service save by acquiescing in the form of the agreement.

*Standard Oil Company v. Perkins*, 347 F.2d 379, 383 (9th Cir. 1965); *Eisele v. Ayers*, 63 Ill.App.3d 1039, 1046, 21 Ill.Dec. 86, 381 N.E.2d 21 (1st Dist. 1978); *Star Finance Corp. v. McGee*, 27 Ill.App.3d 421, 426, 326 N.E.2d 518, 522 (1st Dist. 1975). Both the eligibility certificate and the application are printed on standardized forms prepared solely by USTA. Moreover, the importance of the eligibility certificate under Illinois law makes it essential that any owner wishing to enter his horse in harness races obtain an eligibility certificate. Horse owners, therefore, are in no position to bargain for more favorable terms than those provided in the standard contract. They either must take the certificate on the terms provided by USTA or have their horses declared ineligible to race in Illinois. As a result, this provision on the eligibility certificate provides no basis for deciding that USTA owns those certificates.[21]

Since USTA has failed to persuade the Court that it owns the registration and eligibility certificates, its claim for misappropriation of the information contained therein necessarily must fail. Accordingly, the Court grants the defendant tracks' motion for summary judgment on the misappropriation claim.[22]

## II. ANTITRUST COUNTERCLAIM

Fox Valley has counterclaimed alleging that USTA has organized and participated in a group boycott in violation of the Sherman Act, 15 U.S.C. § 1.[23] Under the Act, not every contract in restraint of trade is prohibited but only those that are "unreasonable." *Standard Oil v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). However, in interpreting the meaning and scope of Section 1, the Supreme Court has ruled that certain kinds of restraints are so inherently unreasonable and anticompetitive in nature that they are illegal *per se*.[24] Included in the *per se* category are group boycotts which generally arise when one party convinces or coerces another party to refrain from dealing with a third party.[25] *Duplex Printing Press Co. v.*

21. Indeed, USTA's reliance on this clause highlights the weakness of its other arguments in support of its ownership of the certificates. At the outset, USTA admits that it has a stronger case for establishing ownership of the eligibility certificate. Memorandum of Plaintiff The United States Trotting Association Re Summary Judgment at 21. Yet, the only difference in the evidence presented by USTA is the existence of this adhesion clause, which for the reasons above the Court finds unpersuasive on the issue of ownership.

22. In so holding, the Court finds solely that USTA has established no proprietary interest in the certificates or the information contained therein. This ruling should not be construed as suggesting that USTA is not entitled to reimbursement for the services it provides to non-member tracks. *See* note 37, *infra*.

23. Section 1 of the Sherman Act provides that "every contract . . . or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal."

24. Restraints deemed unreasonable *per se* generally fall into one of the following categories; (a) vertical and horizontal price-fixing, (b) tying arrangements, (c) vertical and horizontal boycotts, (d) horizontal division of markets, (e) vertical division of markets, and (f) reciprocal dealing. 1 Von Kalinowski, Antitrust Laws and Trade Regulation, § 6.02[3].

25. *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959)

*Deering*, 254 U.S. 443, 446, 41 S.Ct. 172, 174, 65 L.Ed. 349 (1921).

Fox Valley asserts that the facts of the instant case clearly indicate that a boycott exists. The Court agrees that USTA has combined with member horse owners to boycott non-USTA affiliated tracks. All harness racing horses are required by state law to register with USTA [26] and USTA rules effectively require all horse owners to join USTA in order to obtain the necessary certification.[27] Although Illinois does not require tracks to become USTA members, USTA for all practical purposes does by prohibiting USTA members from racing at non-affiliated tracks.[28] Fox Valley and Chicago Downs refused to join USTA or pay a specified fee for services. As a result, member horsemen were warned by USTA that they faced the imposition of USTA sanctions if they continued to race at Fox Valley.[29] Under these circumstances, it is clear that the purpose of USTA's actions is to effectuate a group boycott against tracks which do not abide by its terms and conditions.

Despite the strong language in *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), indicating that a group boycott is *per se* illegal, the Supreme Court has left open the possibility that there are circumstances when the rule of reason test is applicable. In *Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), Silver, a non-member of the Exchange, had been allowed to maintain direct telephone and tickertape connections with Exchange members. When these members were directed by the Exchange to discontinue this service, Silver brought suit alleging an illegal group boycott. The Supreme Court held that a group boycott is a *per se* violation of the antitrust laws "absent any justification derived from the policy of another statute or otherwise." 373 U.S. at 348–349, 83 S.Ct. at 1252. Although federal laws will preclude application of the *per se* rule, the alleged violations still must be justified under the rule of reason. 373 U.S. at 349–361, 83 S.Ct. at 1252–1259. The *Silver* court found no justification for the termination in light of the fact that Silver was not given notice or an opportunity to be heard.

*Silver* reaffirms the application of the *per se* rule to group boycotts with one narrow exception. The cases falling into this category would be governed by the rule of reason. To qualify, several prerequisites must be demonstrated:

(1) There is a legislative mandate for self-regulation or otherwise. . . .

(2) The collective action is intended to (a) accomplish an end consistent with the policy justifying self-regulation, (b) is reasonably related to that goal, and (c) is no more extensive than necessary.

(3) The association provides procedural safeguards which assure that the re-

and *Fashion Originators Guild v. F.T.C.*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941), are cases involving group boycotts. In *Klor's*, plaintiff, a retail dealer, alleged that another retailer, Broadway-Hale, had induced others to stop dealing with *Klor's*. In response, defendant submitted evidence establishing that the boycott had no anticompetitive effects. The Court held that the boycott violated the Sherman Act. In reaching this result, the Court noted that a *per se* illegal agreement could not be justified by application of the rule of reason. *Klor's*, 395 U.S. at 212, 79 S.Ct. at 709.

**26.** Ill.Rev.Stat. (1977) Ch. 8, § 37–3.06(c); *see* note 7, *supra*.

**27.** *See* notes, 8, 9, and 10, *supra*. Under Illinois law, a horse owner wishing to race must register his horse and obtain an eligibility certificate from USTA. To be eligible for the certificate, however, the applicant must be a member of USTA.

**28.** *See* note 11, *supra*.

**29.** The threatened sanctions include (1) revocation of the eligibility certificate and (2) imposition of fines on a driver for each race entered. By threatening sanctions, USTA restricts horsemen to racing at tracks affiliated with USTA. A track may become affiliated by either joining or entering into a contract with USTA. In either case, the fee charged to the track is the same. USTA Article 1, § 4, and Article VII, § 7(c). A track not only has to pay the fee if the track wishes to conduct races with USTA registered horses but also is unable to bargain with USTA over the fee.

straint is not arbitrary and which furnishes a basis for judicial review.

*Denver Rockets v. All-Pro Management, Inc.,* 325 F.Supp. 1049, 1064–1065 (C.D.Cal. 1971).

The first requirement has been satisfied in the instant case. The *Silver* court suggested that, in light of the history of the exchange, self-regulation inherently was required by the market structure and thus falls within the "or otherwise" exception. *Silver, supra; Denver,* 325 F.Supp. at 1064–1065; *Linseman v. World Hockey Association,* 439 F.Supp. 1315, 1321 (D.Conn.1977). The same reasoning is applicable to the facts of this case. The State of Illinois has given the USTA the mandate of regulating harness racing within the state in order to ensure and maintain honesty and integrity in harness racing. Illinois has attempted to achieve this goal without direct government intervention by permitting the USTA to

> take the leadership with Government playing a residual role. Government would keep the shotgun, so to speak, behind the door, loaded, well oiled, cleaned, ready for use but with hope it would never have to be used.

*Silver,* 373 U.S. at 352, 83 S.Ct. at 1254.

■ Although self-regulation is mandated by the grant of regulatory authority to the USTA, the Court does not believe that the second prerequisite has been met. Illinois requires harness racing horses to have USTA registration and eligibility certificates.[30] This requirement ensures that only certified horses will participate in harness races in Illinois. Moreover, by requiring that the results of all races be sent to USTA, Illinois is assured that complete and accurate records are kept.[31] In addition, Illinois not only provides that all horsemen are to be state licensed but also that all

track officials are to be either approved or appointed by the state.[32] These rules allow USTA to exercise effective regulatory control over harness racing in Illinois. Under this regulatory framework, there is no need to require tracks to belong to USTA. Indeed, given the involvement by the State in this scheme, USTA's practices regarding member participation at non-affiliated tracks are more extensive than necessary and are not reasonably related to the legislative goal of maintaining integrity in racing.[33]

For the reasons stated herein, this Court holds that the rule of reason test does not apply. Moreover, the Court finds that USTA has participated in a group boycott, which is a *per se* violation of the Sherman Act. Accordingly, Fox Valley's motion for summary judgment on the antitrust counterclaim is granted.[34]

### III. TORTIOUS INTERFERENCE

Count II of defendants' counterclaim alleges that USTA's boycott constitutes tortious interference with the contract and business relations existing between the horsemen and tracks. Defendants seek an injunction prohibiting USTA from continuing to engage in such conduct. For the reasons stated herein, the Court permanently enjoins USTA from using the group boycott as a means of interfering with the business relationship existing between the tracks and the horsemen.

■ A party may seek an injunction for another's tortious interference with an existing business relationship. *Meadowmoor Dairies, Inc. v. Milk Wagon Drivers Union,* 371 Ill. 377, 21 N.E.2d 308 (1939). In order to prevail on a claim for tortious interference, the following elements must be established:

---

**30.** Ill.Rev.Stat. Ch. 8, § 37–306(c), note 7, *supra*; Illinois Racing Board Rule 9.01, note 9, *supra*.

**31.** Illinois Racing Board Rule 6.10 F.

**32.** Illinois Racing Board Rules 1.03, 6.01, 6.03, 2.01; Ill.Rev.Stat. Ch. 8, § 37–15 (1977).

**33.** Since the second of the three necessary prerequisites of *Silver* has not been satisfied, the

rule of reason is not applicable and the third *Silver* element, the existence of procedural safeguards, need not be addressed.

**34.** USTA also argues that its property interest in the eligibility certificate justifies the boycott. In view of the Court's holding, this argument is also rejected.

[T]he existence of a valid business relationship (not necessarily evidenced by an enforceable—contract) or expectancy; knowledge of the relationship or expectancy on the part of the interferer; an intentional interference inducing or causing a breach of termination of the relationship or expectancy; and resultant damage to the party whose relationship or expectancy has been disrupted.

*Crinkley v. Dow Jones and Co.*, 67 Ill. App.3d 869, 878, 24 Ill.Dec. 573, 385 N.E.2d 714 (1st Dist. 1979); *City of Rock Falls v. Chicago Title and Trust Co.*, 13 Ill.App.3d 359, 363, 300 N.E.2d 331, 333 (3d Dist. 1973). A review of the facts show that all the requirements are present in this case. The existence of a business relationship is clearly shown by the written agreement whereby the Illinois Harness Horsemen's Association agreed to participate in races at defendants' tracks during the period 1974 to 1979.[35] The fact that USTA sent letters to the horsemen warning them about the sanctions that would result from participation in defendants' races indicates that USTA knew of this agreement. It is also evident from the facts that USTA acted with intent to interfere with the relationship by threatening to enforce its sanctions. USTA knew that under these circumstances the horsemen would not race at defendants' tracks. Finally, unless USTA is enjoined from enforcing these sanctions, Illinois horsemen will not be able to race at non-USTA tracks, thus completely disrupting defendants' business.

■ USTA, however, argues that the tort allegations lack merit since USTA is merely protecting an existing economic interest in its eligibility certificate. In addition, USTA states that its conduct was proper because of its pre-existing contractual rights with the horsemen arising from the clause in the eligibility certificate which provides that the horsemen will present the eligibility certificate only to USTA-affiliat-ed tracks.[36] In view of the fact that USTA has not shown that it owns the eligibility certificates, the Court is not persuaded that USTA had any protectible economic interest. Moreover, because the Court has found that USTA's actions constitute a group boycott, the clause in the eligibility certificate restricting racing to USTA-approved tracks cannot be enforced. As a result, the Court holds that USTA's actions amount to tortious interference with the business relationship existing between the tracks and the horsemen. Accordingly, defendants' motion for summary judgment on this count is granted and USTA's cross-motion is denied.

## IV. CONCLUSION

Defendant race tracks' motions for summary judgment on USTA's claim for misappropriation and on their counterclaims for antitrust violations and tortious interference are granted. USTA is hereby enjoined from preventing its members from racing at tracks which are not USTA members or have not paid USTA a specified fee.[37] It is so ordered.

---

**35.** *See* note 16, *supra.*

**36.** *See* note 11, *supra.*

**37.** The Court is not holding that USTA cannot charge a reasonable fee for the services provided to the tracks. However, it is the burden of USTA not only to identify these services but also to show that the assessment is reasonable.