## In re WEST PINE CONSTRUCTION COMPANY, Debtor.

### Bankruptcy No. 82–00486 T.

United States Bankruptcy Court, E.D. Pennsylvania.

Dec. 9, 1987.

---

**316**

Iles Cooper, Williamson, Freidberg & Jones, Pottsville, Pa., for debtor.

Robert H. Kauffman, Rhoda, Stoudt & Bradley, Reading, Pa., for Tri County.

Earl T. Stamm, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., for DiRenzo.

### MEMORANDUM AND OPINION

THOMAS M. TWARDOWSKI, Bankruptcy Judge.

Tri County Land & Coal Company ("Tri County") has presented a multi-faceted motion requesting relief from the automatic stay in the bankruptcy of West Pine Construction Company ("debtor"). Since we find that the lease in question has terminated automatically in accordance with its terms, the debtor no longer has any property interest in the lease, and Tri-County may proceed accordingly.

This chapter 11 bankruptcy was filed on February 5, 1982. Prior to that time, Clarence F. Renninger and Renninger Coal Company, Inc. ("Renninger") had leased[1] to debtor property ("premises") located in Schuylkill County, Pennsylvania for the purpose of strip mining anthracite coal ("lease"). Debtor's amended plan was confirmed on April 3, 1985. The lease is the centerpiece of the debtor's reorganization efforts since it is one of the only assets in the estate.[2] Under the plan, miners other than debtor will mine the leased property

1. The original lease was dated January 9, 1981. On June 10, 1981, the lease was amended to correct an error in the description of the boundaries of the strip mining operation.

2. See Plan of Reorganization, as amended, p. 5, section IV (the only significant assets are two leases to tracts of coal-bearing land); cf. Notes of Testimony ("N.T."), September 5, 1986, cross-examination of Dr. Douglas Colkitt, pp. 21–22 (assets as of September 5, 1986 include a creditors' escrow account for post bankruptcy funds, the Renninger tract, and several pieces of unworkable equipment).

and the proceeds shall be applied to pay royalties to debtor's lesser (now Tri County), after which the balance shall be available for creditors. *See* Plan of Reorganization, p. 7, section V; Supplemental Amendment to Creditors' Committee's Plan of Reorganization and Disclosure Statement, dated November 11, 1982, pp. 2.

Subsequent to the confirmation of the plan, Renninger conveyed the subject premises to Tri County. On August 28, 1985, Renninger also assigned its interest in the lease to Tri County.

The lease is the focal point of this § 362 motion. Paragraph 2 of the lease provides that the debtor is to pay minimum monthly royalty payments of $200.00 per month, and that failure to do so for three consecutive months "shall be deemed a termination." Debtor paid these royalties to Tri County in August, September and October of 1985. Debtor later tendered a check for November and December (1985) royalties, and informed Tri County that it had produced no coal sales during November. That check was accepted by Tri County.

At a later date, debtor sent another check to Tri County covering "min. royalties—1/86, 2/86, 3/86." Tri County alleges that it did not accept or deposit that check because debtor had not produced royalties in excess of $200.00 as required by the lease.

Debtor halted its operations by the end of October of 1985,[3] and was not operating at the time that we took testimony on this matter. Notes of Testimony ("N.T."), September 5, 1986, p. 26 (cross-examination of Dr. Colkitt).

As the docket indicates, the lease has not been assumed. On April 22, 1985, Tri County filed this motion for relief from the automatic stay. Both the debtor and Paul A. DiRenzo jointly with DiRenzo Coal Company (collectively "DiRenzo")[4] have responded and briefed the issues.[5]

Three questions emerge from this backdrop:

(i) Whether the lease has terminated automatically in accordance with its terms, leaving debtor with no property interest;

(ii) Whether the automatic stay prevents Tri County from declaring the lease to be in default as a result of debtor's alleged post-petition violations and breaches of the lease, and

(iii) (assuming that the automatic stay applies) Whether the stay should be lifted and modified to permit Tri County to proceed in accordance with the terms of the lease.

We find that the lease has terminated automatically in accordance with its terms, and thus we do not reach the second or third questions.

Although we hesitate to reduce the parties' excellent and extensive briefs to a mere paragraph, we think that their respective positions on the first question can be broken out as follows. They disagree as to whether the language of the lease causes the lease to terminate automatically upon failure to pay the minimum royalties for

---

**3.** N.T. July 28, 1986, p. 28 (testimony of Dr. Colkitt, chief operating officer of debtor, that debtor ceased operations on the leased premises in late September or early October 1985); *cf.* N.T. July 28, 1986, p. 52 (testimony of Dr. Colkitt that operations ceased at the end of October, 1985) and N.T. July 28, 1986, p. 42 (testimony of Dr. Colkitt that the mining terminated in mid or late October). Debtor suggests in its brief that mining operations were "temporarily halted" in "late October, 1985." Brief of Debtor, p. 3. Debtor does not, however, suggest that mining was resumed.

**4.** DiRenzo's "affiliate," Pennsylvania Anthracite Development Corporation, "... desires to enter into a mining contract with the Debtor ..."

pursuant to the arrangements outlined in the plan. DiRenzo's Brief, p. 4. Mr. DiRenzo is chairperson of the creditors' committee, but references in this memorandum refer to the position taken individually by DiRenzo, and not the committee.

**5.** DiRenzo was not listed as an interested party on the original motion but nonetheless filed an answer. On July 16, 1986, DiRenzo's counsel made an oral motion, requesting permission to be heard, based on DiRenzo's $95,000 proof of claim. N.T. July 16, 1986, p. 9. We overruled Tri County's objection. N.T. July 16, 1986, p. 9. Tri County renewed its objection at a later date and we again overruled the objection. N.T. July 28, 1986, p. 76.

three consecutive months. They also disagree about the weight, if any, to be given to the body of case law discussing post-petition terminations. Finally, they review equitable analyses of forfeiture and reach different conclusions.

We must initially determine whether the lease provides for automatic termination. Tri County urges us to review paragraph 2A, which provides:

> 2. Payments under the terms of this lease shall be as follows:
>
> A. Royalties to be paid ... West Pine shall pay monthly and in advance the sum of $200.00 to be credited toward any royalties payable during said month. A failure to produce royalties above the sum of $200.00 for any three consecutive months shall be deemed a termination of this agreement; ...

Tri County argues that this language causes the lease to terminate automatically upon failure to produce royalties as described therein. Unlike the other paragraphs[6] that discuss violations of the lease, paragraph 2A states that a failure to produce royalties *"shall* be deemed a termination."* (emphasis added) If debtor violates the *other* provisions of the lease, a party seeking redress would be forced to rely on paragraph 12 to effect a cure or termination.

The debtor relies on paragraph 12 for the proposition that debtor *always* retains a right to cure violations of the lease:

> 12. It is further understood and agreed that:
>
> (a) Any violation of the terms of this lease shall at option of Renninger constitute reason for immediate termination of the leasing relationship provided the violation is not corrected within thirty (30) days of written notice

of the same; a failure to correct the default within said thirty (30) days shall cause the removal of all equipment and the cessation of all mining. As a substitute for written notice, oral notice delivered to West Pine in the presence of a witness shall suffice.

> No liability shall attach to Renninger for or on account of said termination.

Debtor also notes that the lease, and paragraph 2A in particular, does not specifically refer to "automatic" termination.

The clear conflict is between the "shall be deemed a termination" language of paragraph 2A and the reference in paragraph 12 to "any violation." In light of this conflict, we now consider certain basic tenets[7] of contract interpretation. In all cases, "(t)he manifest intention of the parties is paramount and the court will adopt the interpretation, which under all circumstances of the case, ascribes the most reasonable, probable and natural conduct to the parties." *Shipping Corp. of India, Ltd. v. Sun Oil Co.*, 569 F.Supp. 1248, 1254 (E.D.Pa.1983). To achieve this goal, a contract should be evaluated as a whole and all of its provisions given effect if possible. *Id.; accord Brennan v. D.J. McNichol Co.*, 439 F.Supp. 499 (E.D.Pa.1977). We must strive to give meaning to each section of the contract and to interpret sections as compatible. *Shipping Corp. of India, Ltd. v. Sun Oil Co.*, 569 F.Supp. 1248, 1254; *accord Thermice Corp. v. Vistron Corp.*, 528 F.Supp. 1275, 1286 (E.D.Pa.1981) (Interpreting Pennsylvania and Ohio law and citing Pennsylvania precedent on this point). Of course, specific references control over general references. *Brennan v. D.J. McNichol Co.*, 439 F.Supp. 499, 503, *citing Captiol Bus Co. v. Blue Bird Coach Lines, Inc.*, 478 F.2d 556, 560 (3d Cir.1973)

---

**6.** For example, paragraph 7 requires that:
West Pine shall conduct the stripping operation in a prudent, skillful and workmanlike manner in order to remove all removal coal without disturbance to the deep mine operations of Walaitis Coal Co.

**7.** Indeed, Pennsylvania cases interpreting mining leases raise these same rules of contract interpretation. *See e.g., In re Essex Coal Co.*, 192 A.2d 675, 678, 411 Pa. 618 (1963) (Each

mining agreement must be judged sui generis and construed by its own terms); *Greenough v. Colonial Colliery Co.*, 1 A.2d 174, 176, 132 Pa.Super. 270 (1938) (Court must give effect to the intention of the parties); *Simmons v. Nastas*, 23 Law.L.J. 401, 407 (Pa.Com.Pl.1972) (Mining leases are to be construed as though they are ordinary leases—the court must look at the entire instrument, the subject matter and the surrounding circumstances).

And, "... if there appear to be repugnant clauses they must be reconciled if possible and an interpretation of one part will not be given which will annul another part." *Kingston Dodge, Inc. v. Chrysler Corp.,* 449 F.Supp. 52, 54 (M.D.Pa.1978), *citing* P.L.E. *Contracts* § 159.

■ We do not think that it was the intent of the parties that a failure to pay royalties be treated similarly to other breaches. Paragraph 12 penalizes debtor for uncured violations by allowing the lesser to "... cause the removal of all equipment and the *cessation of mining."* (emphasis added) It is illogical to suggest that the parties would have intended this to be the penalty for debtor's *failure to mine* and the concomitant failure to produce royalties. The failure to mine and produce royalties bears a stiffer, more immediate penalty—termination without the right to cure.

It is difficult to reconcile the commanding "shall" language of paragraph 2A and the expansive "any violation" language of paragraph 12. But the language in paragraph 12 is general, while the language in paragraph 2A focuses on a specific type of violation. Under the rules enunciated above, we must find that the language in paragraph 2A is controlling. The failure to produce royalties triggers the termination provision in paragraph 2A, leaving for judicial interpretation the question of whether the termination can occur after the defaulting party has filed a bankruptcy petition.

■ Tri County argues that a contract may terminate under ordinary principles of contract law when a default occurs, even if the defaulting party is in bankruptcy. In support of this proposition, Tri County cites a series of cases which the debtor and DiRenzo attempt to distinguish. The Tenth Circuit has issued a significant opinion in this area. *Trigg v. United States of America, Dept. of the Interior, Bureau of Land Management (In re Trigg),* 630 F.2d

1370, 6 B.C.D. 1061 (10th Cir.1980). The *Trigg* debtors leased oil and gas lands. The leases provided that debtors could pursue production *or* pay an annual advance rental of $.50/acre. Absent production, the leases provided that failure to pay the advance rental on or before the anniversary dates would automatically terminate the leases. *Id.* 630 F.2d at 1371. Debtors did not drill wells during the pre-petition period, but did pay the annual advance rentals. They filed a Chapter XI petition, and then failed to tender any subsequent advance rentals. *Id.* 630 F.2d at 1372. Instead, after the anniversary date for payment of advance rentals, they filed adversary actions requesting injunctions to prevent termination of the leases. *Id.* The court held that "(a) contract that provides for termination on the default of one party may terminate under ordinary principles of contract law even if the defaulting party has filed a petition under the Bankruptcy Act." *Id.* 630 F.2d at 1374.

DiRenzo argues that this case can be distinguished because it involved pre-petition leases which simply expired on their termination dates. We disagree because we find the *Trigg* facts highly analogous. *Trigg* involved *annual* advance rentals payable on *annual* anniversary dates. The West Pine—Tri County lease involves minimum *monthly* royalty payments payable on the fifteenth day of each *month.* Lease, para. 2A.

As an extension of this argument, DiRenzo suggests that this case does not fall within the exceptions to the automatic stay outlined in 11 U.S.C. § 362(b)(10),[8] because the lease terminated *prematurely,* and not at the expiration of its *stated term.* Thus, reasons DiRenzo, the automatic stay does apply. The phrase "stated term," of course, is not defined in the Code. We do not accept DiRenzo's facile analysis that "stated term" excludes from its scope all leases that have been terminated as a result of defaults. We believe that the floor

---

**8.** Section 362(b)(10) states that the Code does not create a stay:

(10) ... of any act by a lessor or the debtor under a lease of non-residential real property *that has terminated by the expiration of the*

*stated term* of the lease before the commencement of or during a case under this title to obtain possession of such property ...
11 U.S.C. § 362(b)(10), effective October 8, 1984.

statements [9] from the Senate suggest that a broader definition was intended, one which would clearly include in the category of cases *not* covered by the stay leases terminated as a result of default. We note parenthetically that our analysis may [10] be supported by the fact that none of the cases cited by the parties and decided subsequent to the effective date of the 1984 amendments has applied DiRenzo's § 362(b)(10) analysis.

We also reject DiRenzo's argument that *Trigg* is "irrelevant" because it was decided under the Act, which had no provision similar to § 362(a)(3).[11] DiRenzo ignores a decision from this district on a similar issue in which the Court cites *Trigg* and its predecessors.

> Although these cases were decided under the Bankruptcy Act of 1898 and involved leases or licensing agreements, the Court finds these factors to be minor distinctions. The reasoning and authority expressed therein are most persuasive when applied to the case *subjudice.*

*Intermet Realty Partnership v. First Pennsylvania Bank,* 26 B.R. 383, 388 (Bankr.E.D.Pa.1983).

Other courts have chosen to apply *Trigg* in a Code setting. *See e.g., Moody and Jermoo's Inc. v. Amoco Oil Co.,* 734 F.2d 1200, 11 C.B.C.2d 1, 11 B.C.D. 1310, Bankr. L.Rep. para. 69,872 (7th Cir.1984), *cert. den.* 469 U.S. 982, 105 S.Ct. 386, 83 L.Ed.2d 321 (1984); *In re P.I.N.E., Inc.,* 52 B.R. 463 (Bankr.W.D.Mich.1985); *cf. Jenkins v. Peet (In re Jenkins)* 13 B.R. 721, 4 C.B.C.2d 1425 (Bkrtcy.Colo.1981), *rev. and rem.* 19 B.R. 105 (D.Colo.1982) (application of *Trigg* inappropriate when issue is extension of redemption period).

Debtor's attack on *Trigg* is similarly unpersuasive. *Trigg,* according to debtor, gives us the power to restrain cancellation of a contract in order to preserve a business. *In re Trigg,* 630 F.2d 1370, 1373. At best, this is dicta because the *Trigg* court held that since the debtors had waited until "... *after* the lease had lapsed by their own terms ...," the leases could terminate under ordinary principles of contract law. *Id.,* 630 F.2d at 1374. Assuming, arguendo, that we do have the equitable powers to which the debtor alludes, neither *Trigg* nor debtor's analysis provides us with a rationale for applying those powers.

**9.** Senator Hatch explained:
> The bill provides that non residential real property subject to a lease that has terminated by the expiration of its stated term is not property of the estate and that a proceeding or action by the landlord to regain possession of the property is not stayed. *A lease that has terminated at the expiration of the stated term of such lease is a lease under which the lessee no longer has any renewal or extension rights.* 130 CONG.REC. S8895 (daily ed. June 29, 1984) (statement of Senator Hatch on P.L. 98–353, H.R. 5174) (emphasis added).

**10.** Of course, these cases may have involved other issues, but we find it significant that DiRenzo's § 362(b)(10) analysis was not applied by any of these courts. *See e.g., In re DeSantis,* 66 B.R. 998, 15 B.C.D. 229 (Bankr.E.D.Pa.1986) (whether the lease had been terminated by state court proceedings prior to the bankruptcy leaving debtors with no § 541 property or no assumable interest); *In re P.I.N.E., Inc.,* 52 B.R. 463 (Bankr.W.D.Mich.1985) (whether lease expired by its own terms upon failure to tender delay rentals); *In re Crabb,* 48 B.R. 165, 12 C.B.C.2d 704 (Bankr.D.Mass.1985) (whether interest of lessee expired pursuant to lease terms post-petition). We must reject DiRenzo's argu-

ment that § 362(b)(10) "codified" the pre–1984 amendment cases cited by Tri County. Indeed, these cases suggest that the *Trigg* analysis is unaffected by § 362(b)(10).

**11.** Section 362(a)(3) provides that the stay applies to "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). *Trigg* interpreted Rule 11–44(a) of the Bankruptcy Act, which provided:
> *(a) Stay of Actions and Lien Enforcement* A petition ... shall operate as a stay of the commencement or the continuation of any court or other proceeding against the debtor, or the enforcement of any judgment against him, or any act or the commencement or continuation of any court proceeding to enforce any lien against his property, or of any court proceeding, except a case pending under Chapter X of the Act ..."

Although the *Trigg* court held that Rule 11–44(a) was not broad enough to prevent the termination of the leases, *In re Trigg,* 630 F.2d 1370, 1372, DiRenzo has not shown that § 362(a)(3) of the Code is broad enough to resuscitate a lease that has terminated in accordance with its terms.

*Trigg* has been applied in this district. *In re Intermet Realty Partership*, 26 B.R. 383. *Intermet* was a complaint to enjoin a bank from interfering with possession of debtor's real property. Debtor had signed installment sales agreements [12] calling for quarterly interest payments with a final date for the principal payment. *Id.* at 385. The agreements provided that a failure to make the principal payment would cause automatic termination. *Id.* Debtor filed its bankruptcy petition five days before the final payment date. *Id.* The court was called to determine whether Intermet retained an equitable possessory and contractual interest in the property. On the date of the petition, the court explained, debtor held an equitable interest in the property. *Id.* at 387. Finding that the agreement was an option, the court held that it expired when the final payment was missed, and that there was no interest that could be termed an "executory contract" for the debtor to assume. *Id.* at 388.

West Pine suggests, without significant analysis, that *Intermet* cannot be precedent in the instant case because it involved an option contract. We disagree, because the attributes of option contracts are not such that they should influence our determination of when or whether a contract has terminated. Time is of the essence in option contracts. *In re Intermet Realty Partnership*, 26 B.R. 383, 388; *In re Roswog*, 48 B.R. 689, 692 (Bankr.M.D.Pa.1985), this is the key characteristic [13] of option contracts relevant to an analysis of *when* an option contract terminates. Of course, time may also be of the essence in other

types of contracts if it is so specified. *Bogojavlensky v. Logan*, 124 A.2d 412, 415, 181 Pa.Super. 312 (1956). Debtor suggests that an option may automatically terminate. This does not prove that an option is the *only* type of agreement that can terminate automatically upon failure of performance. Both the *Intermet* "option" contract and the West Pine—Tri County lease identify specific points in time at which they weill terminate if payment is not forthcoming.

DiRenzo distinguishes *Intermet* and the balance of Tri County's authority by arguing that:

> ... the expiration of the lease or contract in question occurred due to the mere passage of time of the contractual term which had been set *prior* to the filing of the petition. In other words, the termination in those cases was not premature: the pre-petition contract or option term simply expired.

DiRenzo Brief at pp. 6–7. We see no reason to distinguish cases in which a specific term or performance date was set pre-petition from cases such as the instant in which the parties freely agreed [14] that certain performance (payment of royalties) would occur, absent which the lease would terminate. Indeed, a term was set in the lease, beginning in any month in which the minimum royalties were not paid and extending for two additional, consecutive months, at the expiration of which the lease would terminate if three monthly payments had been missed.

*Trigg* has not been limited to cases involving option contracts.[15] *See e.g., In re*

---

**12.** The original agreement had been signed by the bank as property owner and a third party, who later sold the property to Intermet.

**13.** Consider the other identifying features of option contracts. According to one source, "(t)he distinguishing characteristic of an option contract is that it imposes no binding obligation upon the person holding the option; ..." 17 AM.JUR.2d *Contracts* § 32 pp. 370–71 (1964). The Restatement suggests that "(a)n option contract is a promise which meets the requirements for the formation of a contract and limits the promisor's power to revoke an offer." RESTATEMENT (SECOND) OF CONTRACTS § 25 (1981). The offer itself must be irrevocable, and this irrevocability has been described as

"(t)he principal legal consequence of an option contract. *Id.,* Comment d.

**14.** We realize that Tri County received its rights by assignment, but debtor was one of the original parties to the underlying lease.

**15.** Tri County's reliance on *In re Jenkins*, 13 B.R. 721, is inappropriate. *Jenkins* was a request for injunctive relief to stop defendants from issuing deeds upon the expiration of a statutory redemption period. The *Jenkins* court noted "(a) substantial distinction must be drawn between the tolling of the statutory period of redemption and the stay of termination of a contract ... the termination of a right to redeem is an automatic

**322**

*P.I.N.E., Inc.,* 52 B.R. 463, 465 (Bankr.W. D.Mich.1985).[16]

Allowing Tri County to treat this lease as terminated would not create impermissible forfeiture. DiRenzo is correct that equity may abhor forfeiture,[17] but the overriding consideration is the sanctity of the agreement between the parties. As our district court noted,

> (w)hile under Pennsylvania law, a court will strive where possible to interpret a contract to avoid a forfeiture, when the parties to the contract have expressly provided therein what the effect of a default shall be, a court is not free to rewrite the contract.

*Rhodes v. Superior Investigative Services, Inc.,* 437 F.Supp. 1012, 1017. (E.D.Pa.1977).

■ Our conclusion would be the same even if we extended our analysis further to consider whether the enforcement of a forfeiture would impede the chapter 11 plan. *See e.g., In re Cordaro,* 20 B.R. 814, 816 (Bankr.N.D.Fla.1982). The West Pine plan was confirmed over two and a half years ago, and mining operations ceased over two years ago.[18] The plan as it exists now cannot be impeded because it is not being implemented.

■ Assuming, arguendo, that the lease has terminated by its own terms, debtor suggests that it still retains an equitable

interest in the property sufficient to invoke the automatic stay. Debtor cites a decision from this district for the proposition that "possession alone" creates "a scintilla of equitable interest" subject to the stay. Debtor's brief, p. 9, *citing Colonial Village Meat Market Leasing, Inc. v. Andorra Meat Market, Inc. (In re Andorra Meat Market),* 7 B.R. 744, 746 (Bankr.E.D.Pa. 1980). We read *Andorra* differently. First, the premises had been destroyed by fire, *Id.* at 745, and thus Andorra could not have had physical possession of the premises. *See* Debtor's brief, p. 9 (*cf.* debtor's analysis that "possession alone" is sufficient). Second, although decisions from other districts have held that some vague "de facto" possession is sufficient to invoke the § 362(a)(3) stay, the court noted that such an interest is "... not to be equated with the concept of 'equity' found in § 362(d)(2)(A)." *Id.* at 746. Lacking that equity, we might lift the stay if the property were *also* unnecessary for an effective reorganization. 11 U.S.C. §§ 362(d)(2)(A) and (B). Unlike *Andorra,* in which the destroyed premises were obviously not necessary for the reorganization, access to the Tri County premises is key to the West Pine reorganization. We need not go that far in our analysis, however, because we find that West Pine lacks even a "scintilla" of equitable interest.

feature of state law." *Id.,* 13 B.R. at 724. On appeal, the district court stated that reliance on *Trigg* in this redemption scenario was misplaced, and reversed and remanded the case. 19 B.R. 105, 110 (D.Colo.1982).

**16.** Although the *P.I.N.E.* Court cited the rule in *Trigg* as the basis for its analysis, it went on to analyze the specialized oil and gas language in the lease to determine whether termination had occurred. 52 B.R. 463, 465–68.

**17.** Although none of the cases cited by DiRenzo apply Pennsylvania law, we accept the proposition that under *certain circumstances* equity may abhor forfeiture. *See e.g., Hotel Associates, Inc. v. Trustees of Central States (In re Hotel Associates),* 3 B.R. 343, 345, 6 B.C.D. 160, Bankr. L.Dec. para. 67,597 (Bankr.E.D.Pa.1980) (court must consider "practical realities" to determine "... what is necessary, what is fair and what is workable").

**18.** Aside from the fact that neither debtor nor any subcontractor is currently mining, we note that other provisions of the plan also lie fallow.

The plan provides that the debtor is to amend its By–Laws to create a new three member board. *See* Supplemental Amendment, pp. 1–2. According to Dr. Douglas Colkitt, chief executive officer and shareholder of debtor, the new board was never created. N.T. July 28, 1986, p. 69. Section V of the plan provides that cash proceeds from mining shall be deposited in a special account known as a "Creditors' Fund," and that a disbursing agent shall disburse the funds every six months in accordance with the plan. *See* Plan, Section V, p. 7. Dr. Colkitt testified that West Pine operated for several months prior to the time in October, 1985 when operations ceased. N.T. July 28, 1985, p. 71. The resulting Creditors' Fund totalled approximately $30,000. *Id.* The funds have not been turned over to a disbursing agent, in spite of the fact that over two years have elapsed since their accrual. *Id.* at p. 72. Indeed, Dr. Colkitt testified that "... the mechanism of setting up a disbursing agent and disbursement of those funds is yet to be established." *Id.*

It is undisputed that no actual mining has occurred on the premises since late October, 1985. The inspector from the Pennsylvania Department of Environmental Resources (PennDER) did note that Barren Coal Company was on the premises preparing to engage in exploration drilling on January 9, 1986, N.T. May 21, 1986, pp. 57–8, but that he never observed any actual mining. N.T. May 21, 1986, p. 77.

Most importantly, debtor's chief executive officer testified that the debtor does not have any mining equipment on the premises:

Q. But West Pine itself did not have any mining operation on the tract, Is that correct? Since you took over West Pine.

A. West Pine did not operate the equipment on day-to-day operations. That's correct.

Q. *West Pine does not have any such equipment. Is that correct?*

A. *That's correct.*

N.T. July 28, 1986, pp. 37–38 (testimony of Dr. Colkitt) (emphasis added).

Although the subcontractors may have had equipment on the premises, a close look at the nature of the equipment suggests that it should not be used to stake (so to speak) West Pine's claim. Dr. Colkitt noted that the major piece of equipment on the premises at the time operations ceased was the drag line, and that it was leased out for use on another site. N.T. July 28, 1986, pp. 55–56. The other equipment, according to Colkitt, was either at the site or stored near the site. *Id.* at p. 56. Szumlanski, the PennDER inspector, visited the site on May 20, 1986, and noted the equipment present. N.T. May 21, 1986, p. 76. He found a small dozer "evidently clearing a road so they could get the drag line out once they got it loaded on a flat bed." *Id.* Although he found a Bucyrus Erie Shovel, it had no engine and had not been moved since the inspector first visited the site in November of 1985. *Id.* at 76–77, 55. Thus,

even the subcontractors have removed all operable equipment from the premises. We find that debtor lacks any equitable possessory interest sufficient to invoke the stay.

██ Although our equitable powers are extensive, 11 U.S.C. §§ 105, 108, we will not invoke them to revive this long dormant lease. We may not resort to equity where a lease has been validly terminated. *In re Crabb*, 48 B.R. 165, 168, 12 C.B.C.2d 704, 707 (Bankr.D.Mass.1985); *In re Intermet*, 26 B.R. 383, 388 ("the filing of a petition for reorganization does not expand the rights of a debtor under an option agreement"). As one court explained:

The trustee contends, however, that we should consider the equities of the instant case—namely, that the property in question is important to the successful reorganization of the debtors—and thus deny the relief requested by the bank. Although such considerations are important in determining whether relief from the automatic stay should be granted, we conclude that they are irrelevant in determining whether the debtors have any interest in the property so that the protection of the automatic stay should apply.

*First Nat'l Bank of Louisville v. Fidelity American Mortgage Company*, 19 B.R. 568, 573 (Bankr.E.D.Pa.1982). The *Fidelity American* analysis is similarly appropriate in this post-petition termination case, because introducing equitable concerns in this equation might cause us to re-write the contract, a clearly impermissible result.

We reach the conclusion that our equitable powers should not be invoked after careful consideration of DiRenzo's vigorous argument that the "equities" in this case mandate a decision in its favor, because Pennsylvania Anthracite would then be able to mine and produce royalties. *See* DiRenzo brief, pp. 15–20. Numerous hurdles [19] would appear before Pennsylvania

---

**19.** First and foremost among these hurdles is that Pennsylvania Anthracite would have to obtain the consent of the landowner, Tri County, before PennDER would issue a permit. *See e.g.,*

N.T. May 21, 1986, pp. 79–80, 120, 130, 140 (testimony of Gregory Szumlanski, surface mine conservation inspector, PennDER); N.T. July 28, 1986, p. 98 (testimony of Mr. Elwood F.

Anthracite could begin to mine. Our feelings about the respective equities in this case are well expressed in a quote (admittedly dicta) cited by Tri County:

> There must clearly come a point in time when the parties to a lease are entitled to a legitimate expectation of finality in connection with their business dealings. It is clearly inequitable to permit a debtor to attempt to cure and remedy a contractual obligation that has already expired. To permit a debtor to attempt to assert rights under an already expired lease by resort to the equitable provisions of the Bankruptcy Code would undermine confidence not only in the certitude of contracts, but in the judicial system itself.

*Marriot Corp. v. Chuck Wagon Bar–B–Que, Inc. (In re Chuck Wagon Bar–B–Que, Inc.)*, 7 B.R. 92, 95, Bankr.L.Dec. para. 67,810 (Bankr.D.C.1980). The bottom line, of course, is that we are unwilling to rewrite the lease.

Wirth, consulting engineer, Penn East Corporation, that landowner consent must be provided for an exploration permit). There is no guarantee that we would, upon proper motion, exercise our § 105(a) power to force Tri County to provide the requisite consent. Assuming, arguendo, that we did, it would still take an additional six months until PennDER issued the permit. N.T. July 28, 1986, p. 104 (testimony of Mr. Elwood F. Wirth). We also have no assurances that West Pine would assume responsibility for those portions of the plan that it can implement itself even without the subcontractors: reconstitution of the board and creation of any appropriate disbursement systems. *Supra*, n. 15. West Pine's track record thus far is poor.