George W. PRETZ, Frank T. Pretz, and George C. Pretz, individually and as Pretz Holstein Farm, a Kansas partnership, Plaintiffs,

v.

HOLSTEIN FRIESIAN ASSOCIATION OF AMERICA, Defendant.

Civ. A. No. 85–2353–0.

United States District Court, D. Kansas.

Sept. 9, 1988.

John C. Gage, J. Patrick Shepard, Gage & Tucker, Overland Park, Kan., M. Warren McCamish, Williamson & Cubbison, Kansas City, Kan., for plaintiffs.

W. Dennis Cross, Larry W. Joye, Morrison, Hecker, Curtis, Kuder & Parrish, Kansas City, Mo., Marc E. Elkins, Morrison, Hecker, Curtis, Kuder & Parrish, Overland Park, Kan., for defendant.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, Chief Judge.

This matter is now before the court on the parties' cross motions for partial summary judgment. Defendant moves for partial summary judgment on counts I, V and VI of plaintiffs' complaint. Plaintiffs did

not respond to defendant's motion; instead, a few days after defendant filed its motion for partial summary judgment, plaintiffs submitted their own motion for partial summary judgment on counts III, IV, V and VI. Plaintiffs' complaint contains six counts: counts I and II allege that defendant caused to be published two false and defamatory articles in *The Holstein World*, which, among other things, caused damage to plaintiffs' business and reputation; counts III and IV allege violations of the Sherman Act, 15 U.S.C. § 1; and counts V and VI allege violations of the Sherman Act, 15 U.S.C. § 2, and request equitable relief in the form of injunction, divestiture and dissolution. For the reasons discussed below, defendant's motion will be granted and plaintiffs' motion will be denied.

In considering the parties' motions for summary judgment, the court must examine all the evidence in the light most favorable to the nonmoving parties. *Barber v. General Elec. Co.*, 648 F.2d 1272, 1276 n. 1 (10th Cir.1981). According to the federal rules, summary judgment is proper only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Under this rule, the initial burden is on the moving party to show the court "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The moving party's burden may be met when that party identifies those portions of the record which demonstrate the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. at 2553.

Once the moving party has met these requirements, the burden shifts to the party resisting the motion. The nonmoving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The party resisting the motion "may not rest upon the mere allegations or denials of his pleadings ..." to avoid summary judgment. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. The mere existence of a scintilla of evidence will not avoid summary judgment; there must be sufficient evidence on which a jury could reasonably find for the nonmoving party. *Id.* at 251, 106 S.Ct. at 2511 (quoting *Improvement Company v. Munson*, 81 U.S. (14 Wall.) 442, 448, 20 L.Ed. 867 (1872)).

For the purposes of these motions, the court will not recount all of the uncontroverted facts, but instead will briefly discuss the circumstances giving rise to this case to place the current motions in a factual context. Plaintiffs George W. Pretz, Frank T. Pretz, and George C. Pretz, individually and as Pretz Holstein Farm, a Kansas partnership, are engaged in the business of breeding, registering, raising, exhibiting, purchasing and selling registered purebred Holstein cattle near Osawatomie, Miami County, Kansas. Defendant Holstein–Friesian Association of America ("HFAA") is a non-profit, membership cattle registry corporation. The HFAA is the sole entity in the United States for the registration of pedigrees of purebred black and white Holstein cattle. The HFAA registers in excess of eighty percent of all the purebred dairy cattle of all breeds registered in the United States. Approximately ninety percent of all the dairy cattle in the United States are Holsteins, either registered or unregistered.

The value of registered animals is significantly greater than the value of unregistered Holstein cattle. To sell an HFAA-registered Holstein in the United States, the record owner must file an application of transfer with the HFAA. In addition, the HFAA has developed International Operating Agreements with similar associations in several foreign nations. To be accepted in a foreign country's herd book, all registered Holsteins exported from the United States must be accompanied by an official HFAA Certificate of Registry. Thus, to engage in the business of breeding, raising, showing, and selling registered purebred Holstein cattle at a "premium" rather than a "grade" or "commercial" level, one must have access to the

privileges and services of the HFAA. Although nonmembers have access to the privileges and services of the HFAA, nonmembers pay $10 to $12 more per registration.

The purpose of the HFAA is to improve the breed of Holstein–Friesian dairy cattle, primarily by gathering, recording and publishing information about the geneology, milk producing ability, and other genetic and physical characteristics of purebred Holstein cattle. The HFAA issues official performance pedigrees and other documentation containing such information and maintains a register of purebred cattle. The economic value of an individual animal is directly related to the actual achievements of its ancestors and the predicted achievements of its descendants, as well as the measurements of its own performance, all as shown on the documentation published by the HFAA.

The milk production testing of dairy cattle, including registered Holsteins, is largely carried out by a system of state and local Dairy Herd Improvement Associations ("DHIAs"), which are affiliated with the National Dairy Herd Improvement Associations ("NDHIA"). The system, called the DHI system, provides for a periodic, independent, and unbiased weighing and analysis of the quantity and butterfat content of the milk produced by each cow owned by the dairy farmers who join the system. Inclusion in the DHI testing program is voluntary with each herd owner, and membership in the state DHIA is not required to engage in the business of milk production. The Kansas Dairy Herd Improvement Association, as part of the national DHI system, regularly engages in the collection and analysis of milk samples of all dairy herds in the state of Kansas.

The milk production records gathered and maintained under this system have a direct bearing on the value of individual animals, their sires and dams, and their offspring. Milk production records are consequently heavily relied on by those involved in the dairy industry. The DHIA test results on all milk samples drawn from a registered Holstein dairy herd are adopted by the HFAA and are essential to the official performance pedigrees issued by the HFAA. Essential to the value of registered Holstein cattle is a full and complete set of production records for each cow, her ancestors and offspring. Expunging records greatly diminishes the value of the subject cow, her offspring, and the other related animals.

The NDHIA maintains and publishes rules and regulations designed to preserve the integrity of the DHI system, to insure the accuracy of the records, and to minimize the opportunity for a dairy herd owner to abuse the DHI system. These are known as the Official Dairy Herd Improvement Rules. Several of these rules are as follows: (1) all weighing, sampling, and recording of milk weights must be done by a DHIA supervisor; (2) the supervisor shall not notify the herd owner of his intent to test the herd any earlier than the completion of the preceding milking period; (3) all milk samples and all recorded test data must be locked up by the supervisor when these are not under his immediate supervision or observation; (4) all dairy cows in the herd, irrespective of ownership, which have ever freshened or come into milk, must be enrolled on the official DHI program and may be removed or "coded out" of the herd only when they leave the herd permanently by transfer, sale, or death; and (5) owners and persons in their employ are held equally responsible with the supervisor for enforcement of the rules and are prohibited from carrying out any responsibilities of the supervisor.

In 1984 and 1985, the KDHIA worked closely with the Kansas State Extension dairyman for the National Cooperative Dairy Herd Improvement Policy Board ("NCDHIP"), James R. Dunham, in conducting and supervising the dairy herd improvement program in Kansas. Late in 1984, Dunham became aware of cattle in the Pretz herd that in his opinion had been improperly or erroneously coded out. This information was not discussed with the Pretz Farm, or any representative thereof, although Mr. Dunham discussed it with Richard E. Nelson, Assistant Executive Secretary of the HFAA.

During an investigation by Mr. Dunham and David Sukup, Executive Secretary of the KDHIA, the two men learned that on November 6, 1984, George C. Pretz, a partner in Pretz Holstein Farm, drew and recorded milk samples while the supervisor was not present. These actions are a violation of rule 5 of the Official Dairy Herd Improvement Rules. On November 7, a supervisor did conduct the test. The supervisor signed the official barn sheets for both November 6 and 7 and forwarded them to the KDHIA lab. The November 6 and 7, 1984, milk production tests were reviewed and examined by Mr. Dunham. A "verification" or "check" test was conducted on November 26 and 27, 1984. In Mr. Dunham's opinion, there was a substantial difference in the average and specific milk weights and butterfat content between the November 6 and 7 tests and the verification tests conducted November 26 and 27, 1984. Mr. Dunham expressed this opinion to Rex Sutton, Manager of Performance Services for HFAA, and Richard Nelson, Special Assistant to the Executive Secretary of the HFAA. Dunham not only informed the HFAA about the alleged discrepancies between the November 6 and 7 tests and the November 26 and 27 verification tests, but he also indicated that he believed the Pretzes improperly coded cattle out of the herd and that they knew when the supervisor was coming to test. These allegations, if true, would be violations of Official Dairy Herd Improvement Rules.

In early 1985, the Pretzes' possible violations of the KDHIA rules were the topic of discussion between the KDHIA and the HFAA, as well as between the KDHIA and the Pretzes. On April 9, 1985, Zane Akins, Chief Executive Officer of the HFAA, sent a letter by certified mail to Pretz Holstein Farm that stated:

Based on the information brought to my attention in accordance with Article I, Section 7 of the Association's bylaws, effective immediately, I am denying you all rights and privileges of the Association. This denial includes business in the name of Pretz Holstein Farm or any other name. I have directed further investigation, after which I will determine if any further action shall be taken.

Before this letter was sent, the HFAA neither proposed charges nor held a hearing on the Pretz matter. However, before sending the letter, Akins obtained the concurrence of the president, the vice-president and the chairman of the executive committee, in accordance with Article I, Section 7 of the HFAA bylaws.

When the HFAA issued the letter notifying the Pretzes that they had been suspended from membership in the HFAA, the HFAA knew that the KDHIA was planning to proceed with notice of charges and a hearing. The HFAA has formerly maintained a "hands off" policy with respect to alleged violations of DHIA testing until such time as the applicable DHIA authority had an opportunity to present charges and render a decision on the charges.

The KDHIA Board of Directors decided in a 4 to 3 vote to conduct a hearing at the state level regarding the alleged violations by the Pretzes. Walter Rottinghaus, who had been involved in the early 1985 discussions regarding the Pretzes and had been kept apprised of the investigation of the Pretz Farm, cast the tie-breaking vote. At the time Rottinghaus cast his vote, he was a competitor of the plaintiffs and his son was an employee of defendant HFAA. On April 25, 1985, the KDHIA issued formal charges against the Pretz Farm. On May 28, 1985, a hearing was held before the KDHIA Board of Directors. On June 28, 1985, after the hearing and a period of deliberation, the KDHIA Board of Directors unanimously found Pretz Holstein Farm in violation of rules 2, 4, 5, and 7 of the Official Dairy Herd Improvement Rules. The penalty assessed by the board of directors changed all DHIA records for Pretz Holstein Farm for the year 1984 from an official status to owner-sampler status.

This apparently was the first formal disciplinary hearing ever held by the KDHIA Board of Directors. Further, apparently never before had a Kansas herd been removed from official DHIA records. The effect of eliminating all 1984 official DHIA

records caused the value of plaintiffs' cattle to be greatly diminished, and thus affected the plaintiffs' business. Additionally, cattle the plaintiffs had previously sold to third parties would be affected by the expungement of official records. The files of the HFAA and the KDHIA contain no evidence that indicates that the plaintiffs' cattle do not produce at the levels reflected by their past production records. There is also no evidence of complaints by purchasers of Pretz cattle with respect to their production and performance.

Also on June 28, 1985, the HFAA issued its first notice of charges. The notice of charges contains no specific allegations or violations, but merely states that Pretz Holstein Farm was found by the KDHIA to be in violation of certain DHIA rules, and adopted that finding as a basis for its charges. The suspension of the rights and privileges of plaintiffs by defendant HFAA continued after June 28, 1985, until a temporary restraining order was agreed upon between the parties and entered by the court on July 18, 1985. The agreed temporary restraining order enjoined defendant HFAA from denying any of plaintiffs' rights and privileges, with certain exceptions. After the preliminary injunction hearing, which occurred on August 1 and 2, 1985, the court ordered that the agreed temporary restraining order would continue in effect until a decision was reached on the application for preliminary injunction. The court issued its decision on plaintiffs' application for preliminary injunction on October 30, 1985. The order set aside the KDHIA hearing of May 28, 1985, and the KDHIA decision issued June 28, 1985. The court also stated that the charges issued by defendant HFAA on June 28, 1985, did not adequately inform plaintiffs of accusations against them and could not serve as a basis of a fair hearing.

On or about January 21, 1986, Zane Akins, Executive Secretary of the HFAA, issued a second notice of charges against the plaintiffs. Charges 1 through 4 alleged violations of official DHI rules. Charges 5 and 6 recommended that the Executive Committee should expunge certain Dairy Herd Improvement Registry ("DHIR") production records pursuant to the provisions and authorities of the combined rules for official DHIR programs. The HFAA conducted a hearing on the second notice of charges, which hearing commenced on March 31, 1986. On June 27, 1986, the Executive Committee of defendant HFAA issued its decision. The Executive Committee's decision was affirmed by the HFAA Board of Directors on November 12, 1986. The decision ordered that each of the DHIR and DHIA lactation records for the fifty-three cows listed in Charge No. 5 be expunged from the production records' performance files maintained by the association, and that any certificate which had been issued in connection with said records be cancelled. Additionally, the decision ordered that defendant HFAA would not publish, recognize or utilize any genetic indexes calculated by the USDA or the HFAA based in whole or in part from the records expunged. Finally, the decision suspended the membership of each of the individual plaintiffs in the HFAA until July 1, 1991, after which date they may apply for membership, provided that they may enjoy the privileges available to nonmembers, except for DHIR testing.

In February and March 1987, plaintiffs sold twenty bulls and one female at a sale in Sulphur Springs, Texas. The cattle were sold to buyers who are primarily commercial breeders and not registered breeders, but who expected to receive transferred registry certificates. The certificates and applications for transfer were sent in promptly after sale, but they have never been returned, despite demands made for their return. Defendants claims that the pedigrees had been copied in such a manner as to conceal the HFAA logo and the date of the issuance of the pedigrees. Additionally, the pedigrees did not reflect the same information appearing on HFAA pedigrees for these particular animals as a result of the Executive Committee decision; *i.e.*, the copies of the pedigrees did not reflect the executive committee's decision to expunge certain lactation records.

After April 9, 1985, plaintiffs' sale of registered breeding stock virtually ceased,

except for sales of several animals which had been contracted prior to April 9, 1985, and except for sales of bulls and females at or a little above commercial prices, such as those sold at the Sulphur Springs, Texas, sales.

### I. Defendant's Motion for Partial Summary Judgment

#### A. *Count I*

Defendant moves for partial summary judgment on count I, arguing that plaintiffs' defamation claim based on an article published November 25, 1985, is barred by the statute of limitations. In their motion for partial summary judgment, the plaintiffs stated:

> In order to simplify issues for trial and without admitting any lack of merit therein, plaintiffs hereby abandon their claims under Counts I and II, preserving and retaining all allegations and evidence in connection therewith that may also be applicable to other Counts.

Given plaintiffs' abandonment of the claims in counts I and II, defendant's motion for partial summary judgment on count I is moot. Counts I and II of plaintiffs' complaint will therefore be dismissed without prejudice.

#### B. *Counts V and VI*

■ Defendant moves for partial summary judgment on counts V and VI, contending that plaintiffs lack standing to seek their requested dissolution or divestiture relief. The defendant assumes, as does the court, that plaintiffs base their equitable relief claims on section 16 of the Clayton Act, 15 U.S.C. § 26, which provides in pertinent part:

> Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections two, three, seven and eight of this act ..., when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted

by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue....

Whether this statutory provision authorizes suits for dissolution or divestiture by private litigants is an unsettled issue. The Sixth and Ninth Circuit Courts of Appeals have held that the remedies of divestiture and dissolution are not available to private litigants, but are instead remedies reserved for the government. *See Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 729 F.2d 1050, 1060 (6th Cir.), *cert. denied*, 469 U.S. 1036, 105 S.Ct. 510, 83 L.Ed.2d 401 (1984); *International Telephone & Telegraph Corp. v. General Telephone & Electronics Corp.*, 518 F.2d 913, 920 (9th Cir.1975). The First Circuit has held the opposite and has allowed private litigants to pursue the remedies of divestiture and dissolution under section 16 of the Clayton Act. *See CIA. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 414 (1st Cir.1985). Because both the First and Ninth Circuits detailed the legislative history and the rationale supporting their contrary conclusions, the court will not repeat their efforts. After careful consideration of both courts' opinions, the court adopts the Ninth Circuit's reasoning and conclusion. The court therefore holds that private litigants cannot sue for divestiture or dissolution under section 16 of the Clayton Act. As the Ninth Circuit explained:

> In holding that the remedy of divestiture is not available we do not jeopardize [a] ... court's ability to restrain [a defendant] effectively from violating the antitrust laws. Injunctive remedies under § 16 may be as broad as necessary to ensure that "threatened loss or damage" does not materialize or that prior violations do not recur.

*International Telephone*, 518 F.2d at 924–25. Accordingly, defendant's motion for partial summary judgment on counts V and VI will be granted and plaintiffs will be

limited to seeking only injunctive remedies under those counts.

## II. Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs move the court for partial summary judgment on counts III, IV, V and VI. Counts III and V allege violations of sections 1 and 2 of the Sherman Act, respectively, based on defendant's actions prior to January 21, 1986. Counts IV and VI allege the same violations, based on defendant's actions on and subsequent to January 21, 1986. The "prior to January 21, 1986," actions of which plaintiffs complain center around the April 9, 1985, letter from Zane Akins, HFAA's Executive Secretary, which notified plaintiffs that Mr. Akins was denying plaintiffs all Association rights and privileges. For ease of discussion, these actions will be referred to as the "first denial of privileges." The "on or subsequent to January 21, 1986," actions of which plaintiffs complain concern the second notice of charges[1] issued January 21, 1986, the subsequent hearing and decision by the HFAA's Executive Committee, and the HFAA's refusal to deliver registry certificates for the animals sold in Sulphur Springs, Texas, in February and March 1987. Again, for ease of discussion, these actions will be referred to as "the second denial of privileges."

As a general rule, summary judgment is used sparingly in antitrust litigation. *Instructional Systems Development Corp. v. Aetna Casualty & Surety Co.,* 817 F.2d 639, 644 (10th Cir.1987) (citing *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962)). This general rule is especially applicable in cases which involve factual issues concerning a defendant's motives and intentions. *See Poller,* 368 U.S. at 472, 82 S.Ct. at 490. The court has spent a great deal of time sifting through the voluminous briefs, and has given considerable thought to plaintiffs' motion. As will be explained below, the court has concluded that plaintiffs' motion for partial summary judgment

on counts III, IV, V and VI should be denied.

### A. *The Section 1 Claims (Counts III and IV)*

■ Section 1 of the Sherman Act prohibits contracts, combinations, and conspiracies in restraint of trade. 15 U.S.C. § 1; *Instructional Systems,* 817 F.2d at 644. Section 1 is thus mainly directed at conduct that destroys competition. *Perington Wholesale, Inc. v. Burger King Corp.,* 631 F.2d 1369, 1377 (10th Cir.1979). Therefore, to succeed on a motion for summary judgment on their section 1 counts, plaintiffs must establish the two essential elements of a Sherman Act section one violation: "an unreasonable restraint of trade and a contract, combination or conspiracy to attain it." *Randy's Studebaker Sales, Inc. v. Nissan Motor Corp.,* 533 F.2d 510, 516 (10th Cir.1976).

Plaintiff has established the existence of a "contract, combination ... or conspiracy...." 15 U.S.C. § 1. As we explained in our Memorandum and Order dated October 30, 1985:

> There is sufficient evidence from the many contacts between defendant HFAA and ... KDHIA to allow a jury to conclude that the[y] ... were engaged in a combination or conspiracy. We point especially to the cooperation between the two [organizations] as they investigated and proposed penalties, and to the March 5 letter from James Dunham to the HFAA, in which he asked the HFAA to "impose severe enough penalties that no further action will be needed by Kansas DHIA." In any event, the bylaws under which the HFAA operated provides sufficient "agreement" to establish the requisite element of combination or conspiracy. *Marrese v. American Academy of Orthopaedic Surgeons,* 496 F.Supp. 236, 241 (N.D.Ill.1980); *McCreery Angus Farms v. American Angus Ass'n,* 379 F.Supp. 1008, 1017 (S.D.Ill.1974), *aff'd*

---

1. The HFAA issued a first notice of charges on June 28, 1985. *See supra,* p. 1534. Because of the preliminary injunction issued by the court

on October 30, 1985, these charges were never pursued. The HFAA also did not withdraw these charges.

506 F.2d 1401 [1404] (7th Cir.1975) [1974].

Plaintiff has not established, however, that defendant's conduct constitutes an unreasonable restraint of trade. To determine whether a business practice is an unreasonable restraint of trade in violation of section 1 of the Sherman Act, the court must first choose between two forms of analysis: the *per se* rule and the rule of reason.

Under the *per se* rule, the court presumes that the practice is unreasonable as a matter of law because of its "pernicious effect on competition and lack of any redeeming virtue...." *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Since the practice is presumed to be an unreasonable restraint of trade, the court makes no elaborate inquiry into the precise harms the practice causes or the business reasons for its use. *Id.; see also Reazin v. Blue Cross & Blue Shield of Kansas, Inc.,* 635 F.Supp. 1287, 1322 (D.Kan.1986). Although the *per se* rule promotes judicial economy by avoiding the need for the detailed inquiry required by the rule of reason, courts are reluctant to declare a business practice unreasonable *per se* and generally do so only after long experience reveals that the practice has a manifestly anticompetitive effect. *See, e.g., Goss v. Memorial Hospital System,* 789 F.2d 353, 354 (5th Cir.1986); *United States Trotting Association v. Chicago Downs Association, Inc.,* 665 F.2d 781, 788 (7th Cir.1981).

Under the rule of reason analysis, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). Therefore, to determine that a business practice violates section 1 of the Sherman Act under the rule of reason analysis, the court must examine " 'the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed,' as well as the actual impact of this restraint on competition." *Hornsby Oil Co., Inc. v. Champion Spark Plug Co., Inc.,* 714 F.2d 1384, 1392 (5th Cir.1983) (quoting *National Society of Professional Engineers v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed. 2d 637 (1978)).

In support of their section 1 claim, plaintiffs allege that defendant HFAA has engaged in a group boycott or concerted refusal to deal with plaintiffs. The Supreme Court has "long held that certain concerted refusals to deal or group boycotts are so likely to restrict competition without any offsetting efficiency gains that they should be condemned as *per se* violations of § 1 of the Sherman Act." *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,* 472 U.S. 284, 290, 105 S.Ct. 2613, 2617, 86 L.Ed.2d 202 (1985) (citing *United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.,* 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); *Klor's, Inc. v. Broadway–Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Associates Press v. United States,* 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); *Fashion Originators' Guild of America, Inc. v. FTC,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941); *Eastern States Retail Lumber Dealers' Ass'n v. United States,* 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914)). According to the *Northwest Wholesale* Court,

> [a] plaintiff seeking application of the *per se* rule must present a threshold case that the challenged activity falls into a category likely to have predominantly anticompetitive effects. The mere allegation of a concerted refusal to deal does not suffice because not all concerted refusals to deal are predominantly anticompetitive. [The plaintiff must make some showing] that the [entity] possesses market power or unique access to a business element necessary for effective competition.

*Northwest Wholesale,* 472 U.S. at 298, 105 S.Ct. at 2621. The courts applying *Northwest Wholesale's* holding have concluded that if a plaintiff makes a threshold showing that a defendant "possesses market power or exclusive access to an element

essential to competition," *id.* at 296, 105 S.Ct. at 2620–21, the *per se* rule applies. If a plaintiff cannot make this threshold showing, however, the challenged activity should be judged under the rule of reason. *See, e.g., Moore v. Boating Industry Ass'n,* 819 F.2d 693, 710–11 (7th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 160, 98 L.Ed.2d 115 (1987); *Fishman v. Estate of Wirtz,* 807 F.2d 520, 541 (7th Cir.1986); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,* 792 F.2d 210, 229 (D.C.Cir. 1986), *cert. denied,* 479 U.S. 1033, 107 S.Ct. 880, 93 L.Ed.2d 834 (1987); *Rickards v. Canine Eye Registration Foundation,* 783 F.2d 1329, 1333 (9th Cir.), *cert. denied,* 479 U.S. 851, 107 S.Ct. 180, 93 L.Ed.2d 115 (1986); *Disenos Artisticos e Industriales, S.A. v. Work,* 676 F.Supp. 1254, 1282 (E.D. N.Y.1987).

Unfortunately, none of the courts applying *Northwest Wholesale* have been faced with facts similar to those of the case at bar. The facts in the case before the court are exactly opposite of those the Supreme Court confronted in *Northwest Wholesale* and those with which the above-listed courts dealt. Again, as we stated in our Memorandum and Order dated October 30, 1985:

> [T]he HFAA possesses very substantial monopoly power. To engage in the business of selling registered Holstein cattle, one simply must be a member of the HFAA. Thus, the HFAA clearly controls "exclusive access to an element essential to effective competition." Under the language quoted above from *Northwest Wholesale,* the HFAA seemingly would be guilty of a *per se* violation of the Sherman Act whenever it terminates or suspends a member.

> Frankly, we doubt if the Supreme Court intended such a result. Organizations like the HFAA could not exist if they cannot police their members without committing antitrust violations. The HFAA is like other industries in which "horizontal restraints on competition are essential if the product is to be available at all." *National Collegiate Athletic Ass'n v. Board of Regents of the Univer-*

*sity of Oklahoma,* 468 U.S. 85, 101 [104 S.Ct. 2948, 82 L.Ed.2d 70] (1984). Indeed, the HFAA, like the cooperative in *Northwest Wholesale,* "must establish and enforce reasonable rules in order to function effectively." *Northwest Wholesale,* 472 U.S. at 296, 105 S.Ct. at 2620. Therefore, despite the fact that plaintiffs have met *Northwest Wholesale*'s threshold requirement, the court is constrained to conclude that meeting this requirement is an insufficient basis for applying the *per se* rule under the circumstances of this case, *i.e.,* when the defendant is a self-regulating, membership association with market power or exclusive access to an element essential to effective competition. To conclude that the HFAA's (or any similar organization's) actions in enforcing its rules and regulations are automatically subject to a *per se* analysis would completely undermine the association's operations and would prevent the HFAA's achieving its purpose—improving the breed of Holstein–Friesian dairy cattle—which ultimately has a positive impact on competition.

As the Seventh Circuit explained: "The concern of the antitrust laws with the integrity of the competitive process ... means that we can only find a violation ... if we have reason to believe that the competitive process has been subverted." *Fishman,* 807 F.2d at 543. Accordingly, even though defendant HFAA possesses exclusive access to an element essential to effective competition, the court cannot hold, as a matter of law, that every HFAA activity "involving a restraint or exclusion will share with the *per se* forbidden boycotts the likelihood of predominantly anticompetitive consequences." *Northwest Wholesale,* 472 U.S. at 295, 105 S.Ct. at 2620. Applying the *per se* rule of analysis in the case at hand is thus decidedly inappropriate. Generally speaking, courts have simply not had the kind of experience with organizations like HFAA that would warrant extending the *per se* rule to its activities. "Except in the rare instances where conduct is unambiguously anticompetitive, this lack of experience should lead us to inquire into the nature and idiosyncracies of a particular enterprise before we assign

a label to its conduct." *United States Trotting Ass'n,* 665 F.2d at 788. Hence, the court holds that the defendant's conduct must be judged under a rule of reason analysis.

In so holding, the court believes it is remaining true to *Northwest Wholesale*'s teachings, prior precedent, and the court's conclusions in its October 30, 1985, Memorandum and Order. First, we are following the Supreme Court's intent in *Northwest Wholesale* to further limit the kinds of group boycotts or concerted refusals to deal that are subject to the *per se* rule. *See, e.g., Disenos Artisticos,* 676 F.Supp. at 1282. Second, our holding is in keeping with analogous cases in which the courts have not applied the *per se* rule to the decisions of sports organizations and service organizations. *See, e.g., United States Trotting Ass'n,* 665 F.2d at 788; *Neeld v. National Hockey League,* 594 F.2d 1297, 1299 n. 4 (9th Cir.1979); *Smith v. Pro Football, Inc.,* 593 F.2d 1173, 1182 (D.C.Cir.1978); *Hatley v. American Quarter Horse Ass'n,* 552 F.2d 646, 652 (5th Cir.1977). Finally, the court believes that a rule of reason analysis provides the appropriate "middle ground between finding a *per se* violation whenever an association with market power punishes a member and allowing an association to terminate a member without providing a fair hearing." *Pretz v. Holstein–Friesian Ass'n,* No. 85–2353, slip op. at 22 (D.Kan., *unpublished,* Oct. 30, 1985). Although the presence or absence of a fair hearing cannot determine whether the correct antitrust analysis is the *per se* rule or the rule of reason,[2] *Northwest Wholesale,* 472 U.S. at 293, 105 S.Ct. at 2619, it certainly affects the factfinder's determination of defendant's motive or intent and the reasonableness of defendant's restraints under a rule of reason analysis. *See Brant v. United States*

*Polo Ass'n,* 631 F.Supp. 71, 78 (S.D.Fla. 1986) ("Plaintiff could argue ... that the lack of procedural due process and fair play ... somehow evidences an anticompetitive motive or intent."); *see also* E. Brunet & D. Sweeney, *Integrating Antitrust Procedure and Substance After Northwest Wholesale Stationers: Evolving Antitrust Approaches to Pleadings, Burden of Proof, and Boycotts,* 72 Va.L.Rev. 1015 (1986) ("provisions for a hearing make cooperative action appear benign"); D. Ledman, *Northwest Wholesale: Group Boycott Analysis and a Role for Procedural Safeguards in Industrial Self–Regulation,* 47 Ohio St.L.J. 729 (1986) ("[P]rocedural safeguards would be relevant in assessing the reasonableness of the trade association's assertions that their self-regulatory activities were consistent with the scope of their mandate for self-regulation.").

■ Applying the rule of reason to the case at hand, the court cannot, as a matter of law, conclude that defendant's first denial of privileges or its second denial of privileges constituted unreasonable restraints of trade and thus violated section 1 of the Sherman Act. Genuine issues of material fact regarding defendant's motives and intentions remain to be decided, thus precluding summary judgment on counts III and IV.

### B. The Section 2 Claims (Counts V and VI)

■ Section 2 of the Sherman Act "prohibits the anticompetitive result described as monopolization." *Perington Wholesale,* 631 F.2d at 1377 (citing *American Tobacco Co. v. United States,* 328 U.S. 781, 809, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946)). Section 2 makes unlawful three kinds of conduct: monopolization, attempts to monopolize, and combinations or conspiracies to monopolize. As defendant points out,

---

**2.** In the court's Memorandum and Order dated October 30, 1985, which granted plaintiffs' motion for a preliminary injunction, we stated: "[T]he Supreme Court's language in *Northwest Wholesale,* to the effect that an absence of procedural safeguards cannot determine the antitrust analysis, is inapplicable to cases in which the plaintiff alleges that the defendant possesses the ability to eliminate the plaintiff from the

market." When the court reached this conclusion, *Northwest Wholesale* was a recent opinion. Nearly three years have passed, and the *Northwest Wholesale* rules have been applied by many lower courts and have been discussed by many antitrust scholars. With the benefit of this guidance, the court has reconsidered its previous conclusion and has decided to abandon it.

plaintiffs' complaint does not clearly allege the type of conduct in which defendant is supposedly engaged. Plaintiffs' motion, however, indicates their claim is based on unlawful monopolization. "The offense of monopolization ... consists of the willful acquisition or maintenance of monopoly power in the relevant market and the existence of actual injury to competition in that market." *Seattle Totems Hockey Club, Inc. v. National Hockey League,* 783 F.2d 1347, 1350 (9th Cir.), *cert. denied,* 479 U.S. 932, 107 S.Ct. 405, 93 L.Ed.2d 357 (1986). To succeed in a motion for summary judgment on their monopolization claims, plaintiffs therefore must prove that the defendant's actions harmed competition, not that its actions merely harmed them in their capacity as competitors. *Id.; Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Plaintiffs' conclusory argument supporting their motion for summary judgment on their monopolization claims fails to prove, as a matter of law, that defendant's actions harmed competition. Again, the court concludes that genuine issues of material fact remain, making summary judgment inappropriate on counts V and VI.

IT IS THEREFORE ORDERED that counts I and II are dismissed without prejudice.

IT IS FURTHER ORDERED that defendant's motion for partial summary judgment is granted as to counts V and VI. Plaintiff may not seek the remedies of divestiture or dissolution, but may seek injunctive relief under counts V and VI.

IT IS FURTHER ORDERED that plaintiffs' motion for partial summary judgment on counts III, IV, V and VI is denied.

IT IS FURTHER ORDERED that this cause is specially set for trial on April 3, 1989, at 1:30 p.m.; for summary trial on November 22, 1988, at 9:30 a.m.; and that a summary trial pretrial conference will be held on October 21, 1988, at 9:30 a.m.